J. B. WAGNER, Appellant, v. J. W. KELSO et al., Appellees.

**LICENSES:** Blue Sky Act—Interest in Common-Law Trust. A "certificate" which represents an interest in a common-law trust is "stock," within the meaning of the Iowa Blue Sky Act. (Sec. 1920-u16, Code Suppl. Supp., 1915.)

**PARTNERSHIP:** The Relation—Common-Law Trust. No partnership relation exists between the trustees of a common-law trust and the shareholders of such trust, when the shareholders hold their interest under an agreement which wholly denies them any voice in the management of the trust.

**LICENSES:** Bonds—Breach. A bond given under the Iowa Blue Sky Act (Sec. 1920-u16, Code Suppl. Supp., 1915), and conditioned "to

pay any and all damages sustained * * * growing out of any transaction appertaining to the business of brokers,'' is breached by the broker's refusal to comply with his agreement to repurchase the stock sold.

*Appeal from Polk District Court.*—J. D. WALLINGFORD, Judge.

APRIL 6, 1923.

PETITION at law, for recovery upon a surety bond issued by the defendant American Surety Company. Demurrer to petition sustained, and plaintiff appeals.—*Reversed.*

*Stewart & Hextell* and *Wessels & Wessels,* for appellant.

*E. D. Samson* and *Walter L. Stewart,* for appellees.

WEAVER, J.—The petition was several times amended upon motions for more specific statement, and as finally perfected, sets up the alleged cause of action substantially as follows:

1. LICENSES: Blue Sky Act: interest in common-law trust. That the defendants Kelso and Ridenour were stock brokers, duly licensed by the secretary of state to carry on such business, and that each had qualified therefor by giving a bond, as required by statute, Chapter 13-B, Title IX, of the Supplemental Supplement to the Code of Iowa, 1915, which bond undertakes that, if the broker therein named ''shall pay any and all fines assessed against him for the wrongful sale of stocks, bonds, or other securities, and shall pay any and all damages sustained by any person or corporation growing out of any transaction appertaining to the business of brokers as defined in such statute, then said obligation shall be void; otherwise to be and remain in full force and effect in law.''

It is further alleged that negotiations were had between said brokers and plaintiff for the sale to plaintiff of 800 shares of the capital stock of the Texlouana Producing and Refining Company, at $1.25 per share, resulting in an oral agreement for the purchase of said shares by plaintiff; that, as a part of said transaction and part of the consideration therefor, said brokers agreed that, in case the defendant should, within the next 60 days, for any reason become dissatisfied with the bargain so

made, they would take back or repurchase said shares for the full contract price, and refund the money; that plaintiff was unacquainted with the merits or value of the shares so purchased, and the promise to repurchase the same was a chief consideration or inducement upon which he relied in making the deal; that, within the prescribed limit of 60 days, he did become dissatisfied therewith, and offered and tendered a return of said shares to said defendants, and demanded the repayment of said price; and that said demand has been refused. Judgment for such sum is therefore demanded against said brokers and their sureties upon the bond. Responding to the defendants' motion, plaintiff attaches to his pleading a copy of the "certificate of interest" issued or delivered to him by said brokers, in the following form:

"Member's Certificate of Interest. Number 1763. Shares 800. Texlouana Producing and Refining Co. Wichita Falls, Texas. Capitalization $2,500,000. Par Value $1.00. This is to certify that J. B. Wagner is the owner of eight hundred shares, fully paid and nonassessable, of one dollar ($1.00) each of the beneficiary interest in the Texlouana Producing and Refining Co., a common law company, transferable only on the books of the company by the owner thereof in person or by duly authorized attorney, upon surrender of this certificate properly indorsed. This certificate is held subject to an agreement and declaration of trust dated January 1, 1920, a duplicate original of which is on file with the trustees, and which is also recorded in the deed records in the county clerk's office in Wichita County, Texas, and which is hereby referred to and made a part of this certificate. No member of said company or owner or holder of this certificate as such shall have any authority, power, or right whatsoever to do or transact any business for or on behalf of or binding upon the company or any member thereof, and no member of this company shall ever be personally liable for any debts, covenants, demands, contracts, or torts of any kind of this company. Witness the signatures of the trustees of said company this 24th day of June.

"Texlouana Producing and Refining Co.

"By Miller Sandusky, Pres.

"Attest: By A. C. Sheehan, Asst. Secretary.

"Registered by Bankers Trust Company of Wichita Falls, Texas. Registrar and Transfer Agent M. M. Harrington, Secretary."

Accompanying this is a printed document, which we assume to be the "Agreement and Declaration of Trust" referred to in the certificate. Its volume, filling 23 pages of the abstract, prohibits its embodiment in this opinion. It calls itself "an agreement and declaration of trust between one Stahl and one Schachner or their assigns and such others as may thereafter become the owners of a certificate or certificates evidencing a beneficial interest of one or more shares in and to the trust estate hereinafter mentioned." Then follows a "whereas" certain contracts and leases for oil, gas, minerals, and other holdings, together with certain privileges, franchises, rights, plans, etc., have been acquired in the name of Stahl and Schachner (such property rights being listed in Exhibit A thereto attached), and whereas Stahl and Schachner had by proper assignment, "to be hereafter filed for record," conveyed the same to the Texlouana Producing and Refining Company, of which said Stahl and Schachner are hereby made trustees, and *"said Texlouana Producing and Refining Company is hereby* created and hereby organized with a capitalization of $2,500,000, divided into 2,500,000 shares of $1.00 each," all of which are to be issued to Stahl and Schachner in payment for "certain properties turned in by them to the company," they agree, "in consideration for $1.00 and other considerations," to turn into the "treasury of this trust estate 1,250,000 of said shares." This preliminary matter concludes as follows:

"Now, therefore, we, the parties hereto, do covenant and agree to and with each other, each for a valuable consideration and mutual covenants and agreements of the others, to hold the property so conveyed for the use and benefit of the present and all future subscribers and *stockholders* in accordance with the following, to wit: * * *."

The Exhibit A referred to, being a list of assets turned in by Stahl and Schachner, consists of 36 items, setting forth such descriptions as "10 acres in Potter County, Texas; 320 acres in Deaf Smith County, Texas; 20 acres in Brown County, Texas; 20 acres in Tom Green County, Texas;" and others of equally

illuminating character. There are further set forth many solidly printed pages, specifying an almost numberless variety of business in which the so-called trust was authorized to engage, and the practically unlimited power of the trustees with respect thereto, and exempting them from liability for failure or negligence in the matter of their duties or powers, provided only that the same should not amount to fraud, embezzlement, or willful breach of trust. It is finally provided that:

"This trust shall continue and remain in force for the term of *twenty years. after the death of the trustees whose names are signed hereto* unless the same shall have been sooner terminated by the action of the trustees, as herein provided. It is agreed that said trustees may, if it seems to them judicious so to do, convey the trust property to new or other trustees, or to a corporation, or otherwise dispose of same, or terminate this trust as in their opinion the interests of the shareholder may demand, being first duly indemnified for any outstanding obligations. Upon the termination of this trust in any manner, the trustees shall at once proceed to liquidate and realize into money all the assets of said estate, and after paying all expenses and indebtedness thereof and charged against the same, and after setting aside all such sums as may be necessary to protect the said trustees or shareholders or the said trust estate against liability for any pending or unsatisfied action, demands, or claims, they shall distribute the residue *pro rata* among the said *shareholders,* and continue said liquidation and distribution until said estate has been fully wound up and all liabilities thereunder discharged and all its assets divided among the said shareholders *pro rata,* and that thereupon. said trust shall cease and determine, and said trustee shall be relieved and discharged. But the said trustees shall not be required to finally wind up, liquidate, and distribute all of the assets of the said trust estate until the full discharge and payment of every expense, indebtedness, or liability of the said estate, whether direct or contingent."

The foregoing is, we think, a sufficient outline of the record to indicate the case made by the petition. Before proceeding to the matter of the demurrer, it should be said that in the petition plaintiff states his alleged cause of action in two counts: First, upon the breach of the alleged agreement to repurchase

the shares, and second, on alleged fraud perpetrated upon him in procuring the contract. The defendant American Surety Company alone demurs to each count, on the following grounds:

"The certificate which it is alleged the plaintiff purchased is not a stock nor a bond nor a security, within the meaning of Chapter 13-B, Section 1920-u, Title IX, of the Code Supplemental Supplement of 1915. It is merely a certificate of a beneficiary share in certain trust property, as fully appears from the exhibits attached to the amendment to said petition and made part thereof.

"2. Damage caused by a breach of a contract to purchase said certificate is not a damage for which plaintiff is entitled to indemnity, under the bond of this defendant sued on herein. In other. words, it is not a damage for which this defendant is liable on said bond."

The demurrer was sustained. Standing upon his cause of action as pleaded, and without further amendment, the plaintiff appeals.

In argument, counsel have to some extent discussed propositions not entirely pertinent to the mere question of pleading which alone calls for our consideration. Does the petition demurred to state a good cause of action against the defendant American Surety Company? . To that inquiry we shall limit our attention.

I. The principal reliance of the appellees is placed upon the first ground of demurrer, that the "certificate" which plaintiff purchased from the alleged brokers is "not a stock nor a bond nor a security," within the meaning of the statute, but "is merely a certificate of a beneficiary share in certain trust property." The statute upon which the plaintiff relies is what is popularly known as the "Blue Sky Act," Supplemental Supplement to the Iowa Code, 1915, Chapter 13-B of Title IX. It provides that:

"Every person, firm, association, company or corporation that shall either directly or through representatives or agents sell, offer or negotiate for sale within this state any stocks, bonds or other securities * * * shall, before doing or offering to do any such business in this state, be required to secure a permit of the secretary of state."

Certain exceptions are provided from the universality of this condition, none of which is applicable to the case at bar. Further provision is made in the same statute, Section 1920-u16, authorizing the secretary of state to issue to any broker or dealer in stocks or bonds or other securities within this state an annual permit, subject to certain conditions, among which is the requirement that, before the permit is granted, the applicant shall give a bond in the sum of $5,000, to be approved by the executive council, which bond shall be subject to forfeiture upon violation of the terms or conditions prescribed by the act.

The petition under consideration alleges that a broker's permit was issued to the defendants Kelso and Ridenour, who, in consideration thereof, made and executed their bond with the American Surety Company, as surety to the state of Iowa for the use of any person or corporation injured or damaged, in the penal sum of $5,000, for the use of the state of Iowa or for the use of any person or corporation injured or damaged. The condition of said bond is that the permit holders shall strictly comply with the provisions of the cited statute, and shall pay "any and all damages sustained by any person or corporation growing out of any transaction appertaining to the business of brokers as defined in such statute." The breach of the bond charged in the pleading is that said brokers sold to the plaintiff 800 shares of the capital stock of the Texlouana Producing and Refining Company, and that, as a part of the contract of sale, it was agreed and understood that if, within the period of 60 days thereafter, plaintiff became dissatisfied with the deal, said brokers would repurchase or take back said stock, and repay or return to plaintiff the purchase price received from him. This condition and undertaking, it is alleged, said defendants repudiated, or refused to perform. Counsel for appellees say that the transaction as pleaded in the petition is not subject to the terms of the statute, because the thing sold to plaintiff was neither stocks nor bonds nor securities; "that the natural, plain, obvious, and ordinary signification of the word 'stock,' as used in the statute, to the understanding of both the professional mind and the mind of the ordinary business man is stock in a corporation, and that * * * it is unimaginable that either the professional or lay mind in Iowa should

understand the word 'stock,' as used in the statute, to mean anything else than corporation stock.''

In support of this somewhat sweeping statement, we are pointed to the fact that the certificate given the plaintiff is not entitled a certificate of shares of stock, but a ''member's certificate of interest,'' and that the company in question calls itself a ''common-law company,'' or a ''common-law trust,'' thus negativing the claim that it is a corporation.

We are not disposed to construe the language of the statute thus narrowly; nor do we think that the right to maintain the action must be made to turn on an accurate determination of the question whether the organization the Texlouana Company is, strictly or technically speaking, a corporation, voluntary association, investment company, common-law trust, joint adventure, or profit-sharing scheme. To properly appreciate the purpose and intent of the statute, one must take into consideration the circumstances and conditions which inspired its enactment, and bear in mind the evils sought to be thereby corrected or suppressed. It is a matter of common and general knowledge that Iowa was being made the field for exploitation of a myriad of speculative schemes, for the most part without merit or substantial foundation, and town and country were swarming with oily tongued salesmen of stocks and shares and interests in ''get-rich-quick'' enterprises, the subscribers to which rarely, if ever, received the slightest return or consideration, beyond a nicely engraved receipt or ''certificate,'' as worthless as the paper on which it was written. To put an end, so far as possible, to this notorious abuse, the Blue Sky Law here in question was enacted. It has since been amended in some particulars by Chapter 189 of the Acts of the Thirty-ninth General Assembly; but, as the transaction which is the subject of this controversy preceded the amendment, it does not affect the rights of the parties now before the court. To say, as do counsel for appellees, that ''stock,'' as that word is here used, means only corporation stock or shares, is to add to the statute what is not there expressed, and to neutralize to a great extent the evident legislative purpose in enacting it. It may be admitted that more often than otherwise the word ''stock'' is used with reference to the shares issued by private corporations; but it is

equally true that in common parlance it is often used in a broader and more general sense, of shares in voluntary associations and other enterprises in which many contribute shares for the promotion of some common purpose. The point made by appellees is perhaps new in this jurisdiction, but it has been considered, and the same or equivalent language construed, by other courts; and, so far as we are able to discover, the authorities are uniformly opposed to the restricted construction which counsel would have us approve. See *People v. Clum*, 213 Mich. 651 (182 N. W. 136); *Home Lbr. Co. v. Hopkins*, 107 Kan. 153 (190 Pac. 601); *Malley v. Bowditch*, 259 Fed. 809. It is true that these precedents were decided under statutes varying in some degree from our own, but in each the court has considered the question whether a ''certificate of interest'' may fairly be included within the general term ''stock.'' The *Malley* case, supra, involved the question whether a statute imposing a stamp tax upon the issuance of certificates of stock applied to the issuance of certificates of interest in a common-law trust. There, as here, counsel contended that certificates of interest were clearly distinguishable from certificates of stock, and therefore were not subject to the requirement. Overruling the point, the court says:

''We are of the opinion that, on the original issue of the certificates of shares of the Pepperell Manufacturing Company, a manufacturing company organized in the form of a trust, under the common law, and deriving none of its rights, qualities, or benefits from.any statute, there was required * * * a stamp tax of five cents on each $100 of face value or fraction thereof.''

After stating the general character of the trust, the court adds that:

''There was thus provided a share capital, as a basis for the issue of transferable certificates evidencing a proportional interest therein, and carrying with them certain rights while the company is a going concern and in its winding up.''

Taking up the contention of counsel that such certificates are not certificates of stock, the court then proceeds to say:

''The word 'stock,' however, is to be interpreted in connection with the accompanying words of the statute, 'association,

company, or corporation.' *It is a term not peculiar to corporations,* but a term equally applicable to the share capital or fund created by or in accordance with an agreement for the formation of an unincorporated association or company. * * * It seems to us clear that the words 'certificate of stock' contain no implication of an intent to exclude common-law associations or companies. A certificate evidencing a transferable share or shares in the share capital of a manufacturing company, whether incorporated, quasi incorporated, or wholly unincorporated, is properly described as a 'certificate of stock.' "

In *Kennedy v. Hodges,* 215 Mass. 112 (102 N. E. 432), the court, in considering the question of local jurisdiction of the ancillary administration of an estate in the assets of which were included certificates of shares in a trust, says:

"There is, on principle, in this respect no distinction between such certificate and a certificate for shares of stock in a domestic corporation."

In *Home Lbr. Co. v. Hopkins,* supra, the company was organized as a so-called trust, much after the manner of the company in this case, and question arose whether such company had complied with the conditions which a statute imposed upon the right to dispose of securities and stock in that state; and it was there held that, as the agreement or declaration of trust provided as does the agreement in this case, giving the company powers and privileges not possessed by individuals and partnerships, it must conform to the regulations imposed on corporations.

The state of Michigan has a "Blue Sky Law" in all essential respects quite similar to our own, and made applicable, with certain exceptions, to "every person, corporation, copartnership, company, or association," and forbidding the sale or negotiation of any stocks, bonds, or other securities until compliance with the conditions named, and making a violation of such statute a punishable misdemeanor. In the case of *People v. Clum,* supra, the defendant, having been convicted of such violation, appealed, and among other things urged, as do appellees in this case, that, as the association which he represented was not incorporated, but was organized under the common law as a trust, the so-called "stock" was, therefore, not stock,

within the meaning of the act; but the court held that "the shares into which the capital of this association was divided, and for which certificates were issued as stated, were stock, within the meaning of the act, the selling and offering for sale of which were forbidden, except as provided by the act."

In the instant case, the so-called agreement of trust is so framed that, if valid, it vests the trustees with all and more than all the powers usually conferred upon corporations. They have absolute control of all the company's property and assets. The shareholders are expressly excluded from any voice whatever in its management or business, and the only enforcible obligation laid upon the trustees is to distribute the remnant, if any there be, of such assets as shall remain when the trust is finally dissolved and all its debts and obligations discharged. Its capital is a share capital, evidenced by certificates which may pass from hand to hand by sale or gift. They expressly provide that the holder has no authority, power, or right whatsoever to do or transact any business for or on behalf of or binding on the company; and the so-called agreement expressly provides that the shareholder shall have no legal right to the property of the trust, and no right to call for a partition of the property or dissolution of the trust. That such shareholders in the nebulous and shadowy substance of the so-called trust are stockholders, we cannot doubt. The so-called agreement of trust is evidently drawn with meticulous care to avoid the use of the words "stock" and "stockholder," and thereby, if possible, to avoid bringing the sale of the shares within the scope of the statute; yet even then, the pen of its author at times slipped, and betrayed him into the use of the natural and approved word, as, for example, where it makes the parties "covenant and agree to and with each other * * * for the use and benefit of the present and all future subscribers and *stockholders;*" and again, in enumerating the multitudinous powers of the trustees, it provides authority to hold and reissue the interest of its capitalization, "its *stock,* and other securities."

It follows, without need of further discussion at this point, that the shares of capital in the so-called trust are "stock," within the meaning of the law.

II. The appellees' position is not entirely clear, in that

they seem to rely, first, upon the proposition that the ''company'' in this case is a trust, pure and simple, and second, upon the proposition that it is a partnership. Respond-ing to the first suggestion, we think it unneces-sary to consider or decide whether, in view of our statutes relating to corporations and associations of various kinds, a ''common-law trust,'' such as this record discloses, is compatible with the public policy of our state; for, even assum-ing its validity for the purposes of this case, we see no reason for excluding it from the operation of the Blue Sky Law, it being the reasonable view in the language of the court in the *Malley* case that the statutory provision regulating the sale of stocks, bonds, or other securities is ''equally applicable to the share capital created by or in accordance with an agreement for the formation of an unincorporated association or company.''

2. PARTNERSHIP: the relation: common-law trust.

Turning, then, to the theory of partnership, nothing can be clearer than that the Texlouana Company is *not* a partnership. It is true that in Massachusetts the existence and legality of common-law trusts have been frequently recognized, and it is also true that, in administering tax laws, some trusts have there been held to be partnerships; but this holding is expressly limited to those trusts in which, by the terms of the agreement, the shareholders are given substantial control of the manage-ment of the trust property. *Williams v. Inhabitants of Milton,* 215 Mass. 1 (102 N. E. 355); *Mayo v. Moritz,* 151 Mass. 481 (24 N. E. 1083). That rule applied to the case before us effectually negatives the claim of partnership; for the agreement set out in the pleadings by repeated and explicit declaration excludes the shareholder from having or exercising any authority or con-trol, and provides that ''the legal title, management, and con-trol of the trust estate is to be fully, absolutely, and exclusively vested in the trustees.'' The resources of the English language seem to have been exhausted in excluding from said agreement any thought or inference of the slightest right or authority in the mere shareholder, or in all the shareholders combined, to assert any right in or to the trust estate, except the right of each to hold his paper certificate, which vests him with the privilege of waiting the full term of 20 years for the expiration of the term of the trust and the possible distribution of the crumbs

which may remain after the trust has satisfied its creditors and the appetite of the trustees. There is no merit in the contention that this company is a partnership.

III. The second ground of demurrer is to the effect that the facts pleaded do not show any breach of the bond on which appellee American Surety Company is surety. If this proposition is correct, then, of course, there can be no recovery on the bond, even though the demurrer be overruled on the first ground. The demurrer admits, for the purposes of this appeal, that the bond sued upon was given by the brokers who made the sale to the plaintiff; that, as a part of said agreement and in consideration of such purchase, said brokers agreed that, upon plaintiff's demand or request, made within 60 days, they would take back or repurchase said shares at the price paid by plaintiff, and that, within the time stipulated, he tendered said certificate to said defendants and demanded the price thereof, and that they refused to perform their agreement, and did not, in fact, intend to perform said agreement, when made. By the terms of the bond, the surety undertakes not only that the brokers will "strictly comply" with the statute, but will "pay any and all damages sustained appertaining to the business of brokers, as defined in such statute." It is to be remembered that this bond is required and given to secure the purchaser of stock against loss or damage by the default or wrong of the broker making the sale. In the language of the instrument itself, the surety undertakes that the broker will pay or make good to the purchaser all damages he may suffer, "growing out of any transaction appertaining to the broker's business." "Damages" is a comprehensive term, including compensation for the default of the party charged therewith. If it be true—and for the purposes of this appeal its truth is conceded—that the brokers induced the plaintiff to make the purchase of the shares and pay his money therefor upon their agreement to repurchase at the same price, if demanded within 60 days, their refusal to redeem their promise, upon due tender and demand, is a default in a matter pertaining to the broker's business; and the allegation thereof sufficiently states a right of action on the bond. The petition is not, in our judgment, vulnerable to the demurrer.

*Margin note: 3. LICENSES: bonds: breach.*

It follows that the trial court erred in sustaining the demurrer, and the ruling and judgment appealed from are reversed. The case will be remanded for further proceedings in harmony with this opinion.—*Reversed.*

Preston, C. J., Stevens and De Graff, JJ., concur.