HEMPHILL v. ORLOFF.

1. APPEAL AND ERROR — TRIAL—JUDGMENT ON DIRECTED VERDICT REQUESTED BY BOTH PARTIES.

Where both parties, without reservation, ask for a directed verdict, neither, on review, may insist that the case should have gone to the jury, and the judgment, if supported by substantial evidence, must be affirmed.

2. COMMERCE—DEALINGS IN COMMERCIAL PAPER NOT INTERSTATE COMMERCE—FOREIGN CORPORATIONS.

Dealings in commercial paper are not transactions in interstate commerce, and it cannot be said that the statute (2 Comp. Laws 1915, § 9063 et seq.), requiring foreign corporations dealing in such paper in this State to obtain a license, imposes a burden on interstate commerce.

¹Appeal and Error, 3 C. J. § 627; 4 C. J. §§ 2625, 2872; Trial, 38 Cyc. p. 1583; ²Commerce, 12 C. J. §§ 36 (Anno), 153 (Anno); 15 A. L. R. 262; 24 A. L. R. 523; 27 A. L. R. 1169; 30 A. L. R. 1331; 40 A. L. R. 1014; 2 R. C. L. Supp. 416; 4 R. C. L. Supp. 490; 5 R. C. L. Supp. 412; 6 R. C. L. Supp. 454.

3. CORPORATIONS — COMMON-LAW TRUSTS EXERCISING CORPORATE FUNCTIONS ARE CORPORATIONS—FOREIGN CORPORATIONS.

Common-law trusts, otherwise known as "Massachusetts Trusts," exercising corporate functions as defined by the Constitution (Art. 12, § 2) and the statute (2 Comp. Laws 1915, § 9071), may be treated as corporations, and therefore come under the provisions of the statute (section 9063 *et seq.*) requiring foreign corporations to obtain a license to do business within this State.

4. SAME—LEGISLATURE MAY DEFINE CORPORATIONS.

It is within the power of the legislature to define a corporation, and if an association falls within such definition the courts will give force to such definition irrespective of whether the association is one organized under statutory authority or not.

5. CONSTITUTIONAL LAW — FEDERAL CONSTITUTION — CORPORATION MAY NOT INVOKE PROVISION PROTECTING CITIZENS.

A common-law trust, organized solely for business purposes and amenable to and governed by a State statute regulating foreign corporations doing business within the State, may not invoke the provision of the Federal Constitution forbidding States from depriving citizens of the United States of their privileges and immunities.

6. CORPORATIONS—COMMON-LAW TRUST—DOING BUSINESS WITHIN THIS STATE.

A common-law trust, with an office within the State, engaged in the business of financing automobile dealers, where continual and repeated business transactions occurred covering a considerable period of time, was doing business within the State, within the meaning of the statute (2 Comp. Laws 1915, § 9063 *et seq.*) requiring foreign corporations to obtain a license to do business within this State.

7. SAME—FAILURE TO COMPLY WITH STATUTE—DIRECTED VERDICT.

In an action on a note by a common-law trust doing business as a foreign corporation within this State without complying with the provisions of the statute (2 Comp. Laws 1915, § 9063 *et seq.*) requiring foreign corporations to obtain a license to do business in this State, a verdict was properly directed in favor of defendant.

[3]Trusts, 39 Cyc. p. 34 (Anno); 7 A. L. R. 612; 10 A. L. R. 887; 31 A. L. R. 851; 35 A. L. R. 502; [4]Corporations, 14 C. J. § 1 (Anno); [5]Constitutional Law, 12 C. J. §§ 825 (Anno), 839; [6]Corporations, 14a C. J. §§ 3977, 3978; [7]Id., 14a C. J. §§ 4002, 4154.

Error to Wayne; Stone (John G.), J., presiding. Submitted January 28, 1927. (Docket No. 97.) Decided May 3, 1927.

Assumpsit by Claude L. Hemphill against Julia Stott Orloff on a promissory note. Judgment for defendant on a directed verdict. Plaintiff brings error. Affirmed.

*Stevenson, Butzel, Eaman & Long* (*Charles A. Wagner* and *Campbell, Bulkley & Ledyard,* of counsel), for appellant.

*Butzel, Levin & Winston* (*Isadore Levin,* of counsel), for appellee.

FELLOWS, J. This action is brought on a note given by defendant, a married woman, to the Commercial Investment Trust, of which plaintiff is vice-president. No question of *bona fide* purchaser is involved, as the note was transferred to him for the purpose of bringing suit. Before taking up the case itself a preliminary question should be disposed of. Both parties asked without reservation for a directed verdict. Defendant's counsel insist that this amounted to a request that the trial court find the facts. We recognize this as being the rule in the Federal courts, but it is not the rule of this court. Both parties having asked for a directed verdict in the court below, neither may insist here that the case should have gone to the jury. The rule of this court is thus tersely stated by Mr. Justice CLARK in *Hannan Real Estate Exchange* v. *Davis, ante,* 257:

"If the court's decision, both parties having requested directed verdict, is right in law and supported by substantial evidence, the judgment must be affirmed."

The defense insisted that the Commercial Investment Trust was a foreign corporation within the

meaning of our Constitution and statutes, and as. it had not complied with the provisions of section 9063 *et seq.,* 2 Comp. Laws 1915, which were in force when the transaction here involved took place, it could not maintain this action. The defense of coverture was also insisted upon. Both defenses were sustained by the trial judge, and a verdict for defendant was directed. We shall only consider the first question.

The Commercial Investment Trust belongs to that class of entities (*Forgan* v. *Mackie,* 232 Mich. 476) frequently referred to as "Massachusetts trusts," and sometimes called "common-law trusts." Its lengthy articles of association denominated "Agreement and Declaration of Trust," which need not be set out in full, cover 18 pages of the record. It will suffice briefly to state some of its provisions. The name under which it shall do business is fixed, and it may have a common seal; seven trustees manage the business; they are elected at annual meetings of the stockholders. The business is primarily that of dealing in commercial paper; later in the instrument the trustees are empowered to buy and sell both real estate and personal property; the trustees elect a president, vice-president, secretary, and treasurer; they may make by-laws and meet monthly; they are given broad powers, and are made masters of the entity and its property; they may charge it by entering into contracts, but the stockholders are not liable for any of their contracts; the trustees may deal in its shares; annual meetings of the stockholders with notice thereof to shareholders are provided for; the shareholders are given "certificates of interest," which are transferable; death of a shareholder or trustee does not affect the entity, and the shares are personal property and go to the representatives of deceased shareholders; the shareholders have no title to the property of the trust. The trustees

may make distributions, and the entity comes to an end on the death of the survivor of seven named persons.

Doubtless entities such as the Commercial Investment Trust receive their name through the fact that for over a century common-law trusts of a commercial character have not been uncommon in Massachusetts. It has been said that this arose from the fact that prior to 1912 corporations were not permitted to be organized for the purpose of dealing in real estate. In many instances they were family affairs, and handled the properties of estate for heirs who desired them held in common. The courts of that State have recognized them and have divided them into two classes, those which were pure trusts and those which were partnerships (*Williams* v. *Inhabitants of Milton*, 215 Mass. 1 [102 N. E. 355], where many of the cases are collected). Mr. Cook, author of Cook on Corporations, in an article appearing in 9 American Bar Association Journal, 763 (1923), upon the subject of "The Mysterious Massachusetts Trusts," doubts the soundness of this classification and distinction, and in *Thompson* v. *Schmitt*, 115 Tex. 53 (274 S. W. 554), it was said by Justice Greenwood, speaking for the court in a case involving a Massachusetts trust:

"Despite the contrary view of eminent courts of other jurisdictions, we cannot allow the mere matter of an express delegation to certain members of a voluntary commercial association of exclusive control over the common property to convert into a trust what would otherwise be universally considered a joint-stock company, with the members subject to the liabilities of partners."

The adoption of the so-called "blue sky laws" by a majority of the States stimulated the creation of Massachusetts trusts. They had a mushroom growth, and trustees under them doubtless invested large amounts of the trust funds of their *cestuis que trustent*

in enterprises which were of doubtful stability, and entered fields of investment, as we shall presently show, before untrodden by trustees having due regard for the safety of the investment of trust funds. It was doubtless thought by their promoters that a plan had been devised which would circumvent these legislative enactments. This court was practically the pioneer in holding that such attempt was unsuccessful. *People* v. *Clum,* 213 Mich. 651 (15 A. L. R. 253). This case has been followed and cited in numerous cases, to some of which we shall presently refer. One of these should be here noted. In *King* v. *Commonwealth,* 197 Ky. 128 (246 S. W. 162, 27 A. L. R. 1159), it was said:

"Hence, it seems to us too plain for argument that the definition of an investment company literally and necessarily includes a common-law trust, the distinguishing features of which are too well understood to require explanation, even though in this State they have not been so frequently encountered as they would be in the immediate future if appellant's contention should be upheld by this court in the face of the unanimous opinion of many courts that have rejected it as unsound in construing almost identical language in similar statutes (citing the *Clum* and other cases)."

Numerous cases are cited by plaintiff's counsel dealing with interstate commerce, but we do not think they are applicable. The trust was dealing in negotiable notes secured by chattel mortgages. The notes were evidence of the indebtedness, and the chattel mortgages were contracts securing a lien on the property covered. In *Nathan* v. *Louisiana,* 8 How. (U. S.) 73, the State had imposed a brokerage tax of $250 upon Nathan who dealt solely in foreign exchange. He insisted that such tax was one upon commerce and beyond the power of the State to levy. His contention was dismissed, the court saying:

238—Mich.—33.

"A bill of exchange is neither an export nor an import. It is not transmitted through the ordinary channels of commerce, but through the mail. It is a note merely ordering the payment of money, which may be negotiated by indorsement, and the liability of the names that are on it depends upon certain acts to be done by the holder, when it becomes payable. * * * Now the individual who uses his money and credit in buying and selling bills of exchange, and who thereby realizes a profit, may be taxed by a State in proportion to his income, as other persons are taxed, or in the form of a license. He is not engaged in commerce, but in supplying an instrument of commerce. He is less connected with it than the shipbuilder, without whose labor foreign commerce could not be carried on."

This was followed in *Paul* v. *Virginia*, 8 Wall. (U. S.) 168, where the right to regulate insurance companies and their contracts of insurance was involved. The court, speaking through Mr. Justice Field, said:

"These contracts are not articles of commerce in any proper meaning of the word. They are not subjects of trade and barter offered in the market as something having an existence and value independent of the parties to them. They are not commodities to be shipped or forwarded from one State to another, and then put up for sale. They are like other personal contracts between parties which are completed by their signature and the transfer of the consideration. Such contracts are not interstate transactions, though the parties may be domiciled in different States."

It is thought by some that the *Lottery Case*, 188 U. S. 321 (23 Sup. Ct. 321), overruled or modified these holdings, but Mr. Justice Harlan, who wrote the majority opinion, somewhat circumscribed the holding by the use of the words we have italicized. He said:

"We come then to inquire whether there is any solid foundation upon which to rest the contention that congress may not regulate the carrying of lottery tickets from one State to another, *at least by corpora-*

*tions or companies whose business it is, for hire, to
carry tangible property from one State to another."*

And in concluding the opinion he said:

"We decide nothing more in the present case than
that lottery tickets are subjects of traffic among those
who choose to sell or buy them; that the carriage of
such tickets *by independent carriers* from one State
to another is therefore interstate commerce; that under
its power to regulate commerce among the several
States congress—subject to the limitations imposed by
the Constitution upon the exercise of the powers
granted—has plenary authority over such commerce,
and may prohibit the carriage of such tickets from
State to State; and that legislation to that end, and
of that character, is not inconsistent with any limita-
tion or restriction imposed upon the exercise of the
powers granted to congress."

In the blue sky cases (*Hall* v. *Geiger-Jones Co.*, 242
U. S. 539 [37 Sup. Ct. 217, L. R. A. 1917F, 514, Ann.
Cas. 1917C, 643] ; *Caldwell* v. *Sioux Falls Stock Yards
Co.*, 242 U. S. 559 [37 Sup. Ct. 224]; *Merrick* v.
*Halsey & Co.*, 242 U. S. 568 [37 Sup. Ct. 227]) it
was insisted that the blue sky laws of the several
States imposed a burden on interstate commerce and
was beyond the power of the States to enact.    The
States insisted that if any burden was laid it was
indirect, and that stocks, bonds, and other securities
were not articles of commerce.    The court sustained
the first contention of the State, and in so doing Mr.
Justice McKenna used significant language, which we
italicize, in the *Hall Case;* he said:

"Upon their transportation into the State there is
no impediment—no regulation of them or interference
with them after they get there.    There is the exaction
only that he who disposes of them there shall be
licensed to do so and this only that they may not
appear in false character and impose any appearance
of a value which they may not possess—and this cer-
tainly is only an indirect burden upon them as objects

of interstate commerce, *if they may be regarded as such.*"

In *Republic Acceptance Corporation* v. *Bennett,* 220 Mich. 249, where the dealings were in commercial paper, as here, we held that the transactions were not in interstate commerce, and we so hold here.

The numerous Massachusetts cases cited by plaintiff's counsel demonstrate that these trusts have been quite uniformly held to be valid, and that the court has been quite liberal in its construction of the terms of various declarations of trust submitted to its consideration.   The legislature of that State has provided some regulation of them (chapter 182, General Laws of Massachusetts 1921).   But we are not here concerned with their validity; nor are we here concerned with the rights of shareholders *inter se,* or their liabilities to creditors of the entities.   What we are concerned with here is whether this entity, as well as others of its class, comes to this State seeking to exercise corporate functions as defined by our Constitution and statutes, and, if so, whether it must, under such circumstances, comply with the requirements exacted by our legislature upon foreign corporations.   In other words, if these entities are here exercising corporate functions, may we treat them as corporations?   Corporations are defined both in our Constitution and statutes.   Section 2, art. 12, of the Constitution, provides:

"The term 'corporation' as used in this article shall be construed to include all associations and joint stock companies having any of the powers or privileges of corporations not possessed by individuals or partnerships."   *   *   *

Section 9 of the act in force when this transaction took place (2 Comp. Laws 1915, § 9071) is as follows:

"The term 'corporations' as used in this act shall be

construed to include all associations, partnership associations, and joint stock companies having any of the powers or privileges of corporations, not possessed by individuals or partnerships, under whatever term or designation they may be defined and known in the State where organized."

In *Eliot* v. *Freeman,* 220 U. S. 178 (31 Sup. Ct. 360), the court had before it the question of whether Massachusetts trusts were liable to the corporation tax provided for in the tariff act of August 5, 1909, and it was held, construing the language of the act, that it had reference to organizations deriving power from statutory enactment. This was followed by the court in *Crocker* v. *Malley,* 249 U. S. 223 (39 Sup. Ct. 270, 2 A. L. R. 1601), where the court had before it the income tax act of October 31, 1913, and held, construing the language of the act, that it was not intended to reach a trust such as the one there involved which was one created by a Maine corporation, which contemplated dissolution, for the benefit of its eight shareholders. But in *Hecht* v. *Malley,* 265 U. S. 144 (44 Sup. Ct. 462), the court had before it the liability of Massachusetts trusts for the excise tax laid by the revenue acts of 1916 and 1918. It was held, following the *Eliot Case,* that they were not liable under the act of 1916, but that they were liable under the act of 1918. We quote from the syllabus:

"The special excise laid by section 1000(*a*) of the Revenue Act of 1918 (40 U. S. Stat. p. 1057), on every 'domestic corporation,'—the act (§ 1) defining the term 'corporation' as including 'associations, joint stock companies, and insurance companies,' and the term 'domestic,' when applied to a corporation or partnership, as meaning 'created or organized in the United States,'—extends to organizations exercising the privilege of doing business as associations under the common law.

"Organizations, known as 'Massachusetts Trusts,' created by trust agreements, whereby property was conveyed to and managed in business operations by

trustees, the shares of the *cestuis que trustent* being represented by transferable certificates entitling holders to share ratably in the income, and upon termination of the trust, in the proceeds of the property, *held* 'associations' created or organized in the United States and engaged in business, within the meaning of the Revenue Act of 1919, *supra*, loc. cit. *Crocker* v. *Malley*, 249 U. S. 223 (39 Sup. Ct. 270, 2 A. L. R. 1601), distinguished."

Mr. Justice Sanford, who wrote for the court, said:

"We think that the word 'association' as used in the act clearly includes 'Massachusetts trusts' such as those herein involved, having *quasi*-corporate organizations under which they are engaged in carrying on business enterprises.    *    *    *

"We conclude, therefore, that when the nature of the three trusts here involved is considered, as the petitioners are not merely trustees for collecting funds and paying them over, but are associated together in much the same manner as the directors in a corporation for the purpose of carrying on business enterprises, the trusts are to be deemed associations within the meaning of the act of 1918."

Judge Anderson, who wrote the opinion in this case in the circuit court of appeals (281 Fed. 363), said:

"It is a matter of common knowledge that, for most business and financial purposes, all the larger organizations of this sort have for years been indistinguishable from corporations.    One might almost say that they are a device under which parties make their own corporation code."

The *Hecht Case* was in turn followed by *Burk-Waggoner Oil Ass'n* v. *Hopkins*, 269 U. S. 110 (46 Sup. Ct. 48).    In this case Mr. Justice Brandeis, speaking for the court, said:

"Since the writ of error was allowed, this court has held in *Hecht* v. *Malley* that associations like the plaintiff are, by virtue of section 1, subject to the special excise tax imposed by the revenue law of 1918 on

every 'domestic corporation.'    *    *    *    Unincorporated joint stock associations, although technically partnerships under the law of many States, are not in common parlance referred to as such.    They have usually a fixed capital stock divided into shares represented by certificates transferable only upon the books of the company, manage their affairs by a board of directors and executive officers, and conduct their business in the general form and mode of procedure of a corporation.    Because of this resemblance in form and effectiveness, these business organizations are subjected by the act to these taxes as corporations."

These later cases demonstrate that it is within the power of the legislative department to define a corporation, and if an association falls within such definition the courts will give force to such definition irrespective of whether the association is one organized under statutory authority or not.

We now turn to the decisions in some of our sister States.    The constitutional definition of corporations in Kansas is very like our own.    In *Home Lumber Co.* v. *State Charter Board,* 107 Kan. 153 (190 Pac. 601, 10 A. L. R. 879), the court had before it the question now before us, *i. e.,* whether a Massachusetts trust was a corporation within the meaning of that term as defined by the constitution.    It was said by the Chief Justice, speaking for the court:

"It does not follow, however, that the plaintiff as organized is entitled to a permit to sell its stock and securities, even if it is found to be solvent, its assets substantial and sufficient, and its plan of business such as would be fair and equitable towards investors.    To meet the requirements of our law the company must bring itself within the rules applicable to corporations and conform to the regulations imposed by the statute on corporations.    The constitution expressly provides that—

" 'The term corporations, as used in this article, shall include all associations and joint-stock companies having powers and privileges not possessed by individuals or partnerships; and all

corporations may sue and be sued in their corporate name.'
(Kan. Const., art. 12, § 6, Gen. Stat. 1915, § 241).

"The first section of article 12 provides that cor-
porations may be created under general laws, and that
no special act conferring corporate powers may be
passed by the legislature.    It requires no argument
to show that the plaintiff has and is proposing to
exercise powers and privileges not possessed by in-
dividuals or partnerships.    There is first the limited
liability under which both shareholders and trustees
are exempted from all personal liability.    The
*corpus* or joint property is to be continued dur-
ing the existence of the trust freed from the rules of
joint tenancy or tenancy in common, and the organ-
ization is not dissolved by the death of a shareholder
or trustee.    The interest of the shareholder is repre-
sented and measured by negotiable shares of stock
which give voting power much the same as does cor-
porate stock.    A common seal is to be adopted and
used substantially as is done by corporations, and the
trustees 'may elect officers who shall have the authority
and duties usually incident to like officers in corpora-
tions.'    It is not necessary to the validity of the
action of the trustees that there should be a concur-
rence of all of them, but it is provided that a majority
of those present and voting at any meeting shall be
sufficient.    Other provisions already mentioned give
the company powers and privileges beyond those
possessed by individuals or partnerships, and within
the rule of the constitution the organization is to be
regarded as a corporation."

*Wagner* v. *Kelso,* 195 Iowa, 959 (193 N. W. 1), like-
wise involved a Massachusetts trust, and it was in-
sisted that its certificates of interest were not stock
within the meaning of the blue sky law.    It was said
by Justice Weaver, speaking for the court:

"In the instant case, the so-called agreement of trust
is so framed that, if valid, it vests the trustees with
all and more than all the powers usually conferred
upon corporations.    They have absolute control of all
the company's property and assets.    The shareholders
are expressly excluded from any voice whatever in its

management or business, and the only enforceable obligation laid upon the trustees is to distribute the remnant, if any there be, of such assets as shall remain when the trust is finally dissolved, and all its debts and obligations discharged. Its capital is a share capital, evidenced by certificates which may pass from hand to hand by sale or gift. They expressly provide that the holder has no authority, power, or right whatsoever to do or transact any business for or on behalf of or binding on the company; and the so-called agreement expressly provides that the shareholder shall have no legal right to the property of the trust, and no right to call for a partition of the property or dissolution of the trust. That such share holders in the nebulous and shadowy substance of the so-called trust are stockholders, we cannot doubt. The so-called agreement of trust is evidently drawn with meticulous care to avoid the use of the words 'stock' and 'stockholder,' and thereby, if possible, to avoid bringing the sale of the shares within the scope of the statute; yet even then, the pen of its author at times slipped and betrayed him into the use of the natural and approved word, as, for example, where it makes the parties 'covenant and agree to and with each other * * * for the use and benefit of the present and all future subscribers and stockholders;' and again, in enumerating the multitudinous powers of the trustees, it provides authority to hold and reissue the interest of its capitalization, 'its stock, and other securities.'

"It follows, without need of further discussion at this point, that the shares of capital in the so-called trust are 'stock,' within the meaning of the law."

The trustees of another Massachusetts trust sought *cestuis que trustent* in Arizona who had funds which they were willing to intrust to trustees, receiving in lieu thereof shares or units of the International Investment & Construction Association. One Clyne purchased $5,000 worth of shares and gave his notes therefor. The trust did not comply with the corporation laws of the State, including the blue sky law. The transaction came before the court in *Reilly* v.

*Clyne,* 27 Ariz. 432 (234 Pac. 35, 40 A. L. R. 1005). The question before the court was thus stated:

"Exercising, as the International Investment & Construction Association has undertaken to do under its declaration of trust, so many of the powers and privileges of a corporation, the question is whether it may do so, or whether the laws of the State were not intended to require such an association before exercising such powers and privileges to conform with the laws governing corporations, associations, and joint-stock companies, and especially those laws governing such companies when dealing in investments."

In an exhaustive opinion it was held that the trust was obliged to comply with the laws of the State, and, not having done so, could not recover on the note sued on.

In *Willey* v. *W. J. Hoggson Corp.,* 90 Fla. 343 (106 South. 408), the Supreme Court of Florida held such a trust to be either a partnership or a joint stock company, saying:

\* \* \* "Such a so-called trust, in which the trustees are pretended to be vested with the power of acquiring and selling property and reinvesting the proceeds of the sale thereof for the common advantage and profit of trustees and subscribers, is nothing but a veiled and futile effort to avoid the liabilities of a copartnership and acquire the privileges and immunities of a corporation without complying with the corporation laws of the State."

The State of Washington has a somewhat similar constitutional definition of corporations to ours.    In *State* v. *Hinkle,* 126 Wash. 581 (219 Pac. 41), it was said:

"The question then arises whether or not this common-law trust is an 'association having powers and privileges of corporations not possessed by individuals and partnerships.' "

After considering the question, the court concludes:

"Under the mandatory provisions of the constitution, the so-called common-law trust is prohibited from doing business within this State. Our corporation laws are sufficiently broad to include every desired form of organization, and there is no reason for resorting to this form of organization except for the purpose of avoiding the payment of the fees, assessments and taxes imposed upon corporations in general and to avoid their statutory regulations. It would seem that the framers of our constitution anticipated such tendency and wisely provided that the term 'corporations' should include 'all associations and joint stock companies having any powers or privileges of corporations not possessed by individuals or partnerships,' and thereby prevented the formation of the self-organized associations of every kind for the purpose of transacting business without meeting the obligations and complying with the statutory regulations of corporations. The plaintiffs have no legal *status* in this State and are without legal standing in this court."

In *Superior Oil Syndicate* v. *Handley,* 99 Or. 146 (195 Pac. 159), the court accepted at its face the claim of a Massachusetts trust that it was a trust and held that if it desired to do a trust business in that State it must comply with the provisions of the Oregon law regulating foreign trust companies, the court saying:

"If the law was not intended to apply to an association like the plaintiff, then the people of the State are unprotected from the operations of concerns which have all the powers of a corporation engaged in the trust business, without the restrictions applied to the operation of such corporations. The statute so construed would be unfair and discriminatory. In order to render it practically inefficacious it would only be necessary for corporations to change their form of organization."

Unless we overlook all the law we have learned concerning the character of investments by trustees of trust funds, we are liable to be disconcerted at least by a contemplation of the character of the projects

into which trustees of Massachusetts trusts invest the funds of their *cestuis que trustent.* Some of the cases give us a glint of the broadened field for investment of trust funds under the modern common-law trust. We enumerate a few of the activities disclosed by the case in which such trust funds have been invested: a mail order business, *Thompson* v. *Schmitt, supra;* dealing in automobiles, *Palmer* v. *Taylor,* 168 Ark. 127 (269 S. W. 996); dealing in automobile tires, *State* v. *Gopher Tire & Rubber Co.,* 146 Minn. 52 (177 N. W. 937); manufacturing road material and road construction, *Weber Engine Co.* v. *Alter,* 120 Kan. 557 (245 Pac. 143); investment and construction, *Reilly* v. *Clyne, supra;* dealing in land, *Weiser Land Co.* v. *Bohrer,* 78 Or. 202 (152 Pac. 869); "a syndicate," *King* v. *Commonwealth, supra; State* v. *Cosgrove,* 36 Idaho, 278 (210 Pac. 393); a toll bridge, *Willey* v. *W. J. Hoggson Corp., supra;* and prospecting for oil, producing, refining and selling it, if found, has not been overlooked, *Wagner* v. *Kelso, supra; State* v. *Summerland,* 150 Minn. 266 (185 N. W. 255); *Betts* v. *Hackathorn,* 159 Ark. 621 (252 S. W. 602, 31 A. L. R. 847); *Hamilton* v. *Young,* 116 Kan. 128 (225 Pac. 1045, 35 A. L. R. 496); *Victor Refining Co.* v. *National Bank,* 115 Tex. 71 (274 S. W. 561).

These entities come to this State masquerading as "pure trusts," claiming the right as disclosed by their so-called declarations of trust to here exercise the "powers or privileges of corporations not possessed by individuals or partnerships," and to here engage in purely business activities usually engaged in by corporations and until of late never engaged in by trustees who have any regard for safety of investment of trust funds. It is the duty of this court to look beyond the form to the substance, to strip them of their finery and to apply the constitutional and statutory definition of corporations to them. Discharging such duty,

we hold that under our Constitution and statutes the Commercial Investment Trust is a corporation organized solely for business purposes and is amenable to and governed by our statute regulating foreign corporations who do business within our borders.

But it is urged that this deprives citizens of the United States of their privileges and immunities. Far from it. No citizen has come to this State to transact business; no citizen has been denied the use of our courts. An entity which under our Constitution and statutes was and is a corporation did business in its corporate name. Every note, every chattel mortgage, every contract was taken by that entity in such corporate name. The authorities are too numerous to cite holding that a corporation may not invoke this provision of the Federal Constitution. This leaves for consideration the question of whether the corporation did business in this State within the meaning of the law.

The Commercial Investment Trust originally solicited business in this State through one of its traveling solicitors. He maintained no downtown office although his residence was in Detroit; he spent but a portion of his time in the State. The business was financing automobile dealers by purchasing from them the paper of their customers secured by chattel mortgages and indorsed by them. As business developed, the Mercantile Finance Corporation with offices at 528 Ford Building, Detroit, looked after the business, Mr. Mayer, its vice-president, giving it his personal attention. While he makes some claim that the Mercantile Finance Corporation took the paper and rediscounted it to the trust the facts refute the claim. The paper was all executed direct to the trust and the chattel mortgages all run to it on a form which it furnished, and the numerous checks issued by the trust show that it paid the dealer direct for the paper and chattel

mortgages purchased.    The name of the Commercial Investment Trust appeared on the door at 528 Ford building, in the telephone directory, as well as the directory of the city's residents.    While not without dispute, there is substantial evidence that Mr. Mayer, the local representative, passed on the paper and handled the transaction in Detroit.    A disinterested witness testified:

"Our method of doing business with them was that we would deliver all papers to Mr. Mayer, and he in turn would deliver the checks to us.    *    *    *    I don't think the paper had to go on to New York for approval.    It gave us plenty of time.    We had to have an answer, sometimes in an hour, an hour and a half, or two hours, and we had that confirmation over the 'phone from Mr. Mayer."

The chattel mortgages were recorded with the city clerk, and Mr. Mayer renewed some of them, and, it fairly appears, discharged others; 198 chattel mortgages running to the trust aggregating approximately $180,000 and purchased from ten different dealers were recorded in the office of the city clerk of the city of Detroit.    They were all executed in Detroit, were upon property located in Detroit, and there is testimony that a small amount of business was done out in the State.    If they were not paid promptly, Mr. Mayer, representing the trust, looked after them. This is not a case of a foreign corporation coming to the State to secure the payment of an antecedent debt, nor is it like *Maxwell* v. *Hammond,* 234 Mich. 461, where the corporation purchased one mortgage on property in the State.    It is a case of continual and repeated business transactions running well up in the thousands and covering a considerable period of time. We think this was doing business in the State (*Republic Acceptance Corp.* v. *Bennett,* 220 Mich. 249, and authorities there cited).    The views of the Federal Supreme Court are illustrated by the case of *Inter-*

*national Textbook Co.* v. *Pigg,* 217 U. S. 91 (30 Sup. Ct. 481, 27 L. R. A. [N. S.] 493, 18 Ann. Cas. 1103), cited by plaintiff's counsel on another branch of the case. The textbook company sent from Scranton, Pennsylvania, to its students in Kansas and other States instructions, books, and apparatus to be used by them under their contract with it. This was held to be interstate commerce. It had in Kansas a solicitor-collector, who solicited business and looked after collections. He maintained an office in Kansas at his personal expense. The company maintained no office in Kansas. It was held that the textbook company was nevertheless doing business in Kansas.

The judgment will be affirmed.

SHARPE, C. J., and BIRD, SNOW, STEERE, WIEST, CLARK, and MCDONALD, JJ., concurred.