MIDWEST MANAGEMENT
CORPORATION,
Appellant,

v.

Morris STEPHENS, John A. Stephens,
Lyman J. Clark, Jr., and Richard K.
Hollingsworth, Appellees.

No. 62062.

Supreme Court of Iowa.

April 23, 1980.

Richard G. Santi of Ahlers, Cooney, Dorweiler, Haynie & Smith, Des Moines, for appellant.

Robert E. Dreher and James L. Sayre of Dreher, Wilson, Adams & Jensen, Des Moines, for appellee Morris Stephens.

David S. Wiggins of Williams, Hart & LaMarca, West Des Moines, for appellees John A. Stephens, Clark, and Hollingsworth.

Considered by REYNOLDSON, C. J., and LeGRAND, UHLENHOPP, McCORMICK and LARSON, JJ.

UHLENHOPP, Justice.

This appeal requires us to decide whether the trial court properly sustained the defendants' motions for summary judgment in an action for breach of contract based on defendants' failure to perform their part of a stock subscription agreement. We consider both the Iowa and federal law of securities as well as the common law of contracts.

Plaintiff Midwest Management Corporation is an Iowa corporation organized in June 1969. Initially it was an insurer operating through its wholly-owned subsidiary, American Sterling Life Insurance Company. Defendant Morris Stephens (Stephens) served as one of the directors and as chairman of the investment committees of both Midwest and American Sterling from August 12, 1969, until December 31, 1971. Midwest asserts that from July 22, 1970, until December 29, 1971, Stephens also served as chief executive officer of Midwest and American Sterling. Defendants dispute this assertion.

In July 1970, defendants Stephens, John A. Stephens, Lyman J. Clark, Jr., and Richard K. Hollingsworth (we refer to latter three defendants as SC&H) approached Midwest with a plan for a new securities broker-dealer business. Midwest was to provide the initial capital for the new business, and defendants were to manage and operate it. To persuade Midwest to finance the broker-dealer business, defendants emphasized their experience in that field and offered to purchase specific amounts of Midwest's common stock and pay for it over a five-year period.

After negotiations an oral agreement was reached during a meeting of Midwest's board of directors on July 29, 1970. Midwest was to provide $250,000 initial capital for the broker-dealer business to be managed by defendants. In return, Stephens allegedly was to purchase 100,000 shares of Midwest's common stock at $1.50 per share, while SC&H were each to purchase 25,000 shares at the same rate. Stephens denies that he so agreed. Midwest's shareholders approved this "package" later the same day. Although the original plan was for the broker-dealership to operate within Midwest's corporate structure, later the business was

operated by a wholly-owned incorporated subsidiary named Hollingsworth, Stephens & Clark.

Pursuant to the agreement, Midwest invested $250,000 in the broker-dealer business and allegedly elected SC&H as the principal officers of Midwest. SC&H deny this allegation. Defendants' stock subscription agreements apparently were not executed until late 1970 or January 1971. At the time the agreements were signed, Stephens allegedly asked that he be allowed to put his own stock subscription contract for 100,000 shares in the name of his son, John A. Stephens. Midwest agreed in return for Stephens' oral promise to stand behind the subscription agreement and see that it was paid. The stock subscription contracts were not registered with the Iowa Insurance Commissioner or the federal Securities and Exchange Commission (SEC).

Defendants managed the broker-dealer business until September 1971, when it failed. Midwest lost its investment of $250,000 in addition to part of a loan of $150,000 it made to the subsidiary after it was incorporated. Defendants refused to pay for the stock under the subscription agreements.

On December 18, 1973, Midwest filed its petition in Polk District Court against SC&H on the subscription agreements they had signed and against Stephens on the subscription agreement he allegedly agreed to stand behind.

Stephens filed an answer and counterclaim. He pleaded eleven affirmative defenses in his answer. SC&H filed answers asserting various affirmative defenses. Both Stephens and SC&H subsequently amended their answers, setting forth additional affirmative defenses.

Defendants subsequently filed motions for summary judgment on seven grounds. Midwest filed a resistance to the motions, accompanied by supporting affidavit. The district court sustained defendants' motions on three grounds: (1) violation of section 502.5(15) of the Iowa Code of 1966 for failure to file a report of sale, (2) violation of section 77e, title 15, United States Code, for failure to file a report of sale, and (3) lack of mutuality of obligation and remedy. (Our code references are to those Iowa and federal codes.)

Midwest asserts that the district court erred both in the standard it applied to defendants' motions and in its sustension of the motions.

I. *Who has the burden?* In its ruling on defendants' motions the district court stated: "Since the Motions under consideration were filed under R.C.P. 237, the burden rests on the Plaintiff to demonstrate specific facts showing there is a genuine issue for trial (R.C.P. 237(e)). This ruling is made with the provisions of R.C.P. 237 in mind." Iowa Rule of Civil Procedure 237(e), on which trial court relied, states in pertinent part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

Midwest contends that the court erred because subsection (c) of Rule 237 has been construed by this court to impose on the movant the burden of showing that no issue of material fact exists. *See Brody v. Ruby,* 267 N.W.2d 902, 904 (Iowa 1978); *Unification Church v. Clay Central School District,* 253 N.W.2d 579, 581 (Iowa 1977); *Meyer v. Nottger,* 241 N.W.2d 911, 916 (Iowa 1976).

■ We agree with Midwest's argument that the court erred in stating that Midwest has the burden. We have considered the interrelationship of subsections (c) and (e) and held that subsection (c) "requires movant to establish by evidentiary matter the absence of a genuine issue and this is so even though no adequate resistance is made." *American Telephone & Telegraph Co. v. Dubuque Communications Corp.,* 231 N.W.2d 12, 14 (Iowa 1975) (citations omitted).

The court's statement regarding the burden does not however prevent us from addressing the substantive issues. The trial court had made a similar statement in *Rohlin Construction Co., Inc. v. Lakes, Inc.*, 252 N.W.2d 403, 406 (Iowa 1977). We stated, *id.*:

> The trial court was wrong in stating the burden was upon the defendants rather than upon plaintiff. However, the trial court's improper statement did not result in error unless the burden was in fact placed on defendants.

. . . .

The question of whether Rohlin established the absence of any genuine issue of material fact must be determined on the basis of what was before the trial court.

We then proceeded to decide whether the trial court's entry of summary judgment was supported by the record. We follow that procedure here.

The district court had before it (1) Midwest's petition and reply to Stephens' counterclaim, (2) defendants' answers, Stephens' counterclaim, and the motions for summary judgment, (3) Midwest's resistance and affidavit, (4) the exhibits attached to Midwest's petition and affidavit, (5) depositions of several individuals including all defendants and David Stanley, director and chairman of the board of Midwest, (6) answers to interrogatories, and (7) admissions. We will view this material in the light most favorable to Midwest in deciding whether defendants met their burden of showing the absence of a genuine issue of material fact. *Drainage District No. 119 v. City of Spencer*, 268 N.W.2d 493, 499 (Iowa 1978).

■ II. *Iowa blue sky law*. The first ground on which the court sustained defendants' motions was that the stock subscription agreements were violative of section 502.6 of the Iowa Code. That section requires registration with the Iowa Insurance Commissioner of any security sold in Iowa "except securities exempt under section 502.4 or unless sold in any transaction exempt under section 502.5." Section 502.-23 of the Code provides that any "contract for sale made in violation of any of the provisions of this chapter shall be voidable at the election of the purchaser . . . ." Midwest does not dispute that the stock subscription agreements on which this action is based are contracts for the sale of securities, nor that the stock covered by the agreements was not registered with the Iowa Insurance Commissioner. Therefore if the subscription agreements are not exempt under section 502.4 or 502.5, defendants would be entitled to rescind the agreements unless they are prevented from doing so by other contentions Midwest makes.

■ The general purpose of blue sky laws is to protect the public from deceit perpetrated in the sale of securities. *See Wagner v. Kelso*, 195 Iowa 959, 966, 193 N.W. 1, 4 (1923). *Accord, McElfresh v. State*, 151 Fla. 140, 144, 9 So.2d 277, 278 (1942); *Terrill v. Hoyt*, 149 Kan. 51, 58, 87 P.2d 238, 243 (1939). *See also*, Note, *Blue Sky Legislation*, 23 Iowa L.Rev. 102, 103–04 (1937). Those laws should be liberally construed to effectuate their purpose. *See Wagner*, 195 Iowa at 966, 193 N.W. at 4. *Accord, McElfresh*, 151 Fla. at 144, 9 So.2d at 278; *Kerst v. Nelson*, 171 Minn. 191, 195, 213 N.W. 904, 905 (1927). If statutory language is susceptible to more than one construction, it should be given the construction which will effect rather than defeat the purpose of the statute. *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124–25, 73 S.Ct. 981, 984, 97 L.Ed. 1494, 1498 (1953); *Tucker v. McDell's, Inc.*, 50 Tenn.App. 62, 68, 359 S.W.2d 597, 599 (1962). Courts do not look to the form but to the substance of a transaction to determine whether it falls within a given provision. *See Sarmento v. Arbax Packing Co.*, 231 Cal.App.2d 421, 424, 41 Cal.Rptr. 869, 871 (1964); *People v. Breckenridge*, 81 Mich.App. 6, 14, 263 N.W.2d 922, 926 (1978); *Suave v. K. C. Inc.*, 19 Wash. App. 659, 665, 577 P.2d 599, 603 (1978). Mindful of these principles we pass to the statutory exemptions and Midwest's other contentions.

A. *Sale-to-existing-shareholder/employee exemption.* Section 502.5 of the Iowa Code provides in part:

Except as hereinafter expressly provided, the provisions of this chapter shall not apply to the offer or sale of any security in any of the following transactions:

. . . .

(4) . . . any transaction pursuant to an offer to existing security holders or employees of the issuer . . . if no commission or other remuneration (other than a standby commission) is paid or given directly or indirectly for soliciting any security holder in this state.

The theory underlying this exemption is that existing shareholders and employees have had a continuing relationship with the issuer and are therefore sufficiently knowledgeable without the information supplied by a registration statement. See 11c H. Sowards & N. Hirsch, Business Organizations: Blue Sky Regulation § 5.13, at 5–165 (1977); Hansell & Neumann, *The Iowa Uniform Securities Act Exemptions Part II: The Transaction Exemptions*, 3 J.Corp.L. 437, 491 (1978).

Midwest contends that its relationship with defendants brings their subscription agreements within this exemption. Midwest argues that Stephens, not his son, was the true purchaser of 100,000 shares, that he was an existing shareholder by virtue of shares of Midwest's stock owned by a closely-held corporation of the Stephens family, and that he was an employee by virtue of his position as a director of Midwest. Midwest also argues that SC&H were employees by virtue of their management positions with both Midwest and the broker-dealer subsidiary.

Defendants deny any status as existing shareholders or employees of Midwest. Stephens argues that his son John, and not he, signed the subscription agreement, that the Stephenses' closely-held corporation, and not he, was an existing shareholder of Midwest stock, and that his nominal status as a director of Midwest did not make him an "employee" for purposes of the section 502.5(4) exemption. SC&H argue that although they were employees of Midwest's broker-dealer subsidiary, they were not employees of Midwest itself, and they are therefore not covered by the sale-to-employees exemption.

With regard to the status of Stephens, the record does not demonstrate the absence of a fact issue as to whether he was the actual purchaser of the Midwest stock. The affidavit accompanying Midwest's resistance states that Stephens agreed on July 29, 1970, to purchase 100,000 shares of Midwest's stock. It also states that "on July 29, 1970, after the agreement had been reached Morris Stephens said that he might want to hold his 100,000 shares through Stephens Industries, Inc., or one of his other interests. . . . [I]t was agreed that Morris Stephens would pay or provide the $150,000 purchase price and could put his 100,000 shares in the name of a person or corporation under his control."

 Substance, not form, must control our blue sky regulations. Parties may not manipulate the applicability of a given regulation by the expedient of placing someone's shares in the name of someone else. Notwithstanding that the subscription contract for 100,000 shares of Midwest was executed by Stephens' son, for purposes of the motion the record contains an issue of fact as to whether Stephens was the actual purchaser.

 The district court was correct however in ruling that a fact issue does not exist as to whether Stephens was an existing shareholder of Midwest. Stephens Industries, not Stephens, was the named holder of the existing shares. Although Stephens admitted by deposition that he controlled Stephens Industries and that his family owned it, the record contains nothing to show that an earlier purchase of Midwest stock by Stephens Industries had no legitimate business purpose. A corporation is an entity separate and distinct from its stockholders. *Briggs Transportation Co. v. Starr Sales Co.*, 262 N.W.2d 805, 809 (Iowa 1978). Although the corporate veil may be pierced in some situations, *see Lakota Girl Scout Council, Inc. v. Harvey Fund-Raising Management, Inc.*, 519 F.2d 634, 638 (8th Cir. 1975), such circumstances

do not appear here. Midwest urges that Stephens Industries should be treated as Stephens' alter ego, but cites no authority for that theory. The language of the exemption is not susceptible to such construction.

 But defendants have not demonstrated the absence of an issue of fact as to whether Stephens was an employee of Midwest when the sale occurred. Stephens apparently does not dispute that he was a director of Midwest at the time in question. The word "employee" does not necessarily include officers and directors but it is certainly susceptible to such construction. *See Phoenix Savings & Loan, Inc. v. Aetna Casualty and Surety Co.,* 427 F.2d 862, 871 (4th Cir. 1970). The theory supporting the employee exemption is that employees are sufficiently knowledgeable regarding their employer as not to need the information supplied by a registration statement. Certainly a director who is fulfilling his function as such should be knowledgeable regarding the issuer's stock if anyone is. We thus conclude that the purpose of the exemption in section 502.5(4) is effectuated by construing the term "employee" to include officers and directors.

 We find also that defendants have not established absence of a fact issue as to whether Stephens was a nominal director or an actual director of Midwest—assuming he may legally claim he was a director in name only in order to get blue sky protection. The record includes the following excerpt from the affidavit Midwest filed:

Morris Stephens had already been serving as a Director of Midwest and American Sterling, and as chairman of the Investment Committee of both companies, since August 12, 1969. In late June or early July, 1970, Morris Stephens agreed that he would manage and supervise American Sterling during the process of closing out American's unsuccessful insurance business, which was expected to continue until sometime in 1971, and he did so. On July 2, 1970, it was agreed that Morris Stephens would serve as President of both Midwest and American Sterling, but

he later told me he would prefer to be designated as general manager rather than President. Therefore, on July 22, 1970, the Board of Directors appointed Morris Stephens as General Manager of both Midwest and American.

In addition, Stephens admitted in a deposition that his duties as director of the investment committees of both Midwest and American Sterling required him to "administer the direction and the sale or holding" of those corporations' investments, and that as general manager of Midwest his function was "to check on the employees that were in Des Moines, to oversee expenses."

We thus find fact issues as to a section 502.4(5) exemption in connection with the sale to Stephens.

 With regard to the status of SC&H, those defendants have shown the absence of an issue of fact on the proposition that they were not employees of Midwest for the purpose of the sales-to-employees exemption. We reject Midwest's argument that the exemption applies equally to employees of an issuer's *subsidiary.* The only authority cited by Midwest in support of its theory is a 1966 letter from the Superintendent of Securities, Iowa Department of Insurance, stating that the sale of a certain company's stock to its employees and to employees of its wholly owned subsidiaries "would appear to be" an exempt transaction under section 502.5(4). The letter cited no authority and gave no reason for so indicating. Informal interpretations by administrative agencies are entitled to consideration, 2A C. Sands, Statutes and Statutory Construction §§ 49.-05, 49.06 (4th ed. 1973), but the plain language of section 502.4(5) is not susceptible to Midwest's theory, and we are not inclined to enlarge blue sky exemptions by construction. Equally important, the exemption for sales to existing employees does not apply to persons who purchase securities at the time they obtain employee status; those persons have not had the opportunity through the employee status to become knowledgeable about the employer's operation.

The stock sales to SC&H do not come within the section 502.4(5) exemption.

**B.** *Sale to broker/dealer exemption.* Section 502.5 of the Iowa Code provides in part:

> Except as hereinafter expressly provided, the provisions of this chapter shall not apply to the offer or sale of any security in any of the following transactions:
>
> . . . .
>
> (5) The offer, sale, transfer, or delivery . . . to any broker or dealer; provided that such broker or dealer is actually engaged in buying and selling securities as a business.

Section 502.3(7) states that " *'[b]roker'* shall mean dealer as herein defined." Section 502.3(4) defines "dealer" as follows:

> *"Dealer"* shall include every person other than a salesman who in this state engages either for all or part of his time directly or through an agent in the business of selling any securities issued by another person or purchasing or otherwise acquiring such securities from another for the purpose of reselling them or of offering them for sale to the public, or offering, buying, selling, or otherwise dealing or trading in securities as agent or principal for a commission or at a profit . . . .

The theory underlying this exemption is that brokers and dealers are sophisticated buyers who do not need the protection of registration. *See* L. Loss & E. Cowett, Blue Sky Law 367 (1958); 11c H. Sowards & N. Hirsch, Business Organizations: Blue Sky Regulation § 5.13, at 5–151 (1977); Hansell & Neumann, *supra* at 471.

Midwest contends that all four defendants qualify as brokers or dealers for the purpose of section 502.5(5). As to Stephens, Midwest argues that the record contains an issue of fact as to whether he is a dealer by virtue of his admitted roles as chairman of four banks, as chairman of the investment committees of Midwest and American Sterling, and as chief executive officer of Midwest and its subsidiaries. As to SC&H, Midwest argues that their admitted past experience in the securities field raises an issue of fact as to whether they were "brokers" within section 502.5(5). In the case of

John A. Stephens that experience consisted of four-years employment as a stockbroker and registered representative with T. C. Hendersen Company, a securities broker-dealer in Des Moines, Iowa. Lyman J. Clark, Jr. was first licensed to deal in securities in 1960 and served as a stock trader with Conway Brothers of Iowa, a securities brokerage company, until the summer of 1970. Richard K. Hollingsworth was employed by T. C. Hendersen Company for five years as office manager, supervising the registration, receiving, and delivering of securities. Midwest also stresses in its affidavit that all four defendants "emphasized their experience in the securities broker-dealer business and their familiarity with the applicable securities laws and regulations" when attempting to persuade Midwest to finance the broker-dealer business.

Defendants deny any status as brokers or dealers under section 502.5(5). First, they contend that section 502.5(5) applies only, according to them, to "*registered* brokers and dealers who purchase securities while in the business of dealing in securities." All defendants deny being registered at the time of sale. Second, they appear to argue that the exemption only applies when the dealer is acting as a dealer with respect to the sale in question (*i. e.,* purchasing stock for resale). Third, SC&H contend that they previously were merely acting as salesmen for a broker-dealer and as such are specifically excluded from the section 502.5(5) exemption.

■ We reject defendants' argument that the exemption provided by section 502.5(5) applies only to registered broker-dealers. *See* Hansell & Neumann, *supra* at 472 n. 236. Although section 502.11 requires the registration of dealers in non-exempt securities, nothing in sections 502.3(4) or 502.5(5) limits the exemption to registered dealers. The language of section 502.5(5) must be construed in light of its underlying rationale—that brokers and dealers are sophisticated buyers who do not need the protection of registration. Assuming that a buyer meets the basic definition of a dealer in section 502.3(4), his registra-

tion has little impact upon his sophistication or need for the protection of registration. We decline to restrict the section 502.5(5) exemption to registered broker-dealers.

■ Defendants' second argument is subject to similar analysis. Whether a broker-dealer is acting as a broker-dealer in the transaction in question has little bearing on his sophistication or need for the protection of registration. The broker acting in behalf of himself presumably employs the same knowledge that he would employ on behalf of a third party. Because section 502.5(5) itself does not require a broker-dealer to be acting as such in the transaction and because refusing to hold otherwise does not impair the purpose of the broker-dealer exemption, we decline to restrict the section 502.5(5) exemption as defendants would have us do.

■ The third argument of SC&H, if uncontroverted as a factual issue, would establish that those defendants do not fall within the section 502.5(5) exemption. "Salesman," a group they claim to be members of, are specifically excluded from the term "dealer" as that term is defined in section 502.3(4). But the record is unclear from SC&H's activity before the time of sale—activity occurring after that time being immaterial—whether they qualify as salesmen under section 502.3(6). Salesmen are persons, other than dealers, "authorized by a dealer or issuer, to sell securities" in-state. § 502.3(6), The Code. The record does not establish as a matter of law that SC&H's involvement in securities trading was so limited. Moreover, executive officers of a corporation registered as a dealer do not qualify as salesmen, id., and the record does not show as a matter of law that SC&H did not serve as executive officers in their prior brokerage-related positions. Hence the third argument of SC&H cannot be accepted for purposes of the motion for summary judgment.

Finally on this part of the case, defendants quote from *Martin v. Orvis Brothers & Co.*, 25 Ill.App.3d 328, 348, 323 N.E.2d 73, 81 (1974): "[U]nless the specific words of the exemption provisions require their inclu-sion, private investors are not denied coverage under the Act merely because they are 'sophisticated investors.' " We agree, but we do not rely on this passage because it specifically applies to "private investors." For us to hold that defendants are "private investors" would ignore part of the record which raises a material issue of fact as to whether defendants were broker-dealers for the purpose of that exemption.

We conclude that defendants have not shown an absence of fact issues as to exemptions which would entitle them to a summary judgment.

C. *Does the time limitation in section 502.23 bar defendants from rescinding?* Section 502.23 of the Iowa Code provides in part (emphasis added):

> Every sale or contract for sale made in violation of any of the provisions of this chapter, shall be voidable at the election of the purchaser . . . ; *provided, that no action shall be brought for the recovery of the purchase price after two years from the date of such sale or contract for sale* . . . .

In 1974 this section was amended to impose a five-year limitation period on actions brought to recover the purchase price of securities sold in violation of the blue sky act. *See* § 614.1(5), The Code 1975.

Midwest asserts that whatever right defendants might have had to void their stock subscription agreement is cut off by the two-year statute of limitations contained in section 502.23 of the 1966 Code. It denies defendants' contention that the five-year limitation period adopted in 1974 should apply retrospectively to defendants' statutory remedies for the alleged blue sky violation.

■ We have no necessity to decide whether the five-year period applies retrospectively because we agree with defendants that by its plain language the limitation period only affects a *buyer's* action to recover the price paid on a contract which violates the blue sky law. The section has no effect on the buyer's right to assert securities law violations as a defense to a

*seller's* action to recover on such a contract. *See Mechanics Loan & Savings Co. v. Mathers*, 185 Ga. 501, 501–02, 195 S.E. 429, 429–30 (1938); L. Loss & E. Cowett, Blue Sky Law 160 (1958).

D. *Defendants' failure to tender their subscription contracts within two years.* Section 502.23 of the Code provides in part (emphasis added):

> Every sale or contract for sale made in violation of any of the provisions of this chapter shall be voidable at the election of the purchaser . . . *upon tender to the seller in person or in open court of the securities sold or the contract made*
>
> . . . .

Apparently defendants have made no tender of their subscription agreements.

Midwest claims that tender is a precondition to a buyer's right to rescind under section 502.23. It also asserts that because tender was not made within the two-year limitation period in section 502.23, defendants may not now tender their stock subscription agreements.

Defendants contend on the other hand that they have a right to rescind the stock subscription agreements which is independent of section 502.23, and that they therefore were not required to tender the agreements. First, defendants assert a common-law right to void the contracts under the rationale of *Lundgren v. Lamoni Provision Co.*, 248 Iowa 887, 82 N.W.2d 749 (1957), and *Lambertson v. National Investment and Finance Co.*, 200 Iowa 527, 202 N.W. 119 (1925). Second, they assert a common-law right to void the contracts on the ground that the contracts are illegal.

▮▮▮▮ We reject defendants' theories for avoiding the tender requirement of section 502.23 because we disagree with the independent grounds they assert for treating their subscription contracts as voidable. They base their first independent ground for rescission on *Lundgren* and *Lambertson*. Those cases involved fraudulent sales of stock. *Lundgren*, 248 Iowa at 897, 82 N.W.2d at 755; *Lambertson*, 200 Iowa at 529, 202 N.W. at 120. Fraud is a common-law doctrine, the violation of which gives

rise to a right of rescission. *Id.* The case at hand contains no allegation of fraud. Defendants' reliance on *Lundgren* and *Lambertson* is thus misplaced.

▮▮▮▮ Defendants' second independent ground is illegality, but they cite no authority for treating the agreements as illegal. Presumably they rely on section 502.23 which entitles purchasers to treat sales agreements as *voidable* under certain circumstances. Voidable contracts are quite different from illegal contracts; a voidable contract may be ratified while an illegal contract usually may not. *See* Restatement of Contracts § 475, Comment b, § 512, Comment c (1932). Moreover, section 502.23 itself contains the tender requirement. Neither of defendants' asserted independent grounds for rescinding their subscription agreements is viable.

▮▮▮▮ We thus hold that defendants must comply with the tender requirement of section 502.23. *See Weisbrod v. Lowitz*, 282 Ill.App. 252, 258 (1935); *Joslin v. Noret*, 224 Mich. 240, 247, 194 N.W. 983, 984 (1923); *Wisconsin Mutual Plate Glass Insurance Co. v. Guaranteed Bond Co.*, 218 Wis. 197, 203, 260 N.W. 484, 486 (1935). Since however the limitation period on actions by purchasers does not prevent them from asserting violations of chapter 502 defensively after the period has expired, neither does it prevent them from tendering their subscription agreements in the same circumstances. Because section 502.23 allows tender to be made in court, we hold that defendants may tender their subscription contracts to Midwest in court on remand.

E. *Estoppel to assert blue sky violations.* Midwest offers three distinct estoppel theories which it says bar defendants from denying liability on their subscription contracts. The first is "[p]romissory estoppel, resulting from defendants' promise to buy stock, plaintiff's action in reliance to its detriment, and the equities in favor of plaintiff." The second is "[e]stoppel by involvement with plaintiff corporation or its business—either as promoters, by participation in management, or by accepting bene-

fits." The third is "[e]stoppel by failure to insist on compliance with securities laws while holding a responsible position with the corporation."

Defendants argue that estoppel is not available to Midwest on several grounds. First, they assert that estoppel was not properly pleaded and therefore cannot be relied on. Second, they argue that the subscription agreements were illegal and that "nothing including estoppel can breathe any life" into the contracts. Third, they contend that "the only function of estoppel in securities litigation is to prevent a purchaser from recovering his money," hence estoppel is not available to a seller in an action for the price.

■ As to defendants' first argument, this court has held that a party must plead estoppel in order to rely on it at trial. *See Watts v. Archer,* 252 Iowa 592, 600, 107 N.W.2d 549, 553 (1961); *Robbins v. Beatty,* 246 Iowa 80, 89, 67 N.W.2d 12, 17 (1954); *Abel v. Abel,* 245 Iowa 907, 921, 65 N.W.2d 68, 75 (1954). Those cases however were decided prior to a change in our rules of pleading dispensing with the necessity of a reply to affirmative defenses in the answer. *See* Iowa R.Civ.P. 68, 72, 73. Iowa Rule of Civil Procedure 104 provides that "[e]very defense in law or fact to any pleading must be asserted in the pleading responsive thereto, if one is required, or *if none is required, then at the trial . . . ."* (Emphasis added.) Because Midwest was not required to file a reply to defendants SC&H's affirmative defenses, it could assert its estoppel theory at trial. *See Warder & Lee Elevator, Inc. v. Britten,* 274 N.W.2d 339, 343 (Iowa 1979). We are not dealing here with a case in which a plaintiff pleads estoppel in the petition.

■ Neither do we find that Midwest has failed to plead estoppel properly as against Stephens so as to prevent it from asserting estoppel against him. Unlike SC&H, Stephens filed a counterclaim, which does require a responsive pleading under Iowa Rule of Civil Procedure 68. Defendants assert that Midwest did not timely file a reply to that counterclaim. But the mo-

tions for summary judgment now before us were not granted on Stephens' counterclaim. Summary judgment was granted against Midwest on its own causes of action. Even if Midwest were precluded from asserting estoppel against Stephens' counterclaim, it could assert estoppel against his affirmative defenses which do not require such a reply.

■ We proceed to defendants' second argument—the question of whether estoppel is available to a seller who has violated blue sky requirements. This court has said that the doctrine of equitable estoppel is founded on "principles of morality and fair dealing and is intended to subserve the ends of justice." *Sioux City v. Johnson,* 165 N.W.2d 762, 767 (Iowa 1969). The court has applied the doctrine in a variety of circumstances, even, as Midwest points out, to estop a party from relying on a statute which was enacted to protect a class of persons to which he belongs. *See, e. g., Wetzstein v. Dehrkoop,* 241 Iowa 1237, 1245, 44 N.W.2d 695, 698–99 (1950) (tenant estopped to assert violation of Iowa statute regulating termination of farm tenancies); *State Bank Building Co. v. Pierce,* 97 Iowa 668, 671, 61 N.W. 426, 427 (1894) (purchaser under unpaid stock subscription agreement estopped to assert corporation's failure to comply with Iowa corporation statute governing incorporation). Responding, defendants argue that subscription agreements violative of chapter 502 are "illegal." We have already stated however that section 502.23 renders violative contracts "voidable," and that a contract which is voidable may be ratified. Although the authorities are not in complete agreement, a number of jurisdictions have held that when a sale of securities is made voidable only, the purchaser may estop himself to assert the invalidity. *See De Lamar Mines of Montana, Inc. v. Mackay,* 104 F.2d 271, 274 (9th Cir. 1939) (Utah law); *Popper v. Havana Publications, Inc.,* 122 So.2d 247, 248 (Fla.App. 1960); *Westhusin v. Landowners' Oil Association,* 143 Kan. 404, 408, 55 P.2d 406, 408 (1936); *Kaye v. Sunbeam Quarries Co.,* 258 Ky. 190, 197, 79 S.W.2d 700, 703 (1935);

*Schrier v. B. & B. Oil Co.*, 311 Mich. 118, 125, 18 N.W.2d 392, 394–95 (1945); *Farrar v. Hood*, 56 N.M. 724, 732, 249 P.2d 759, 765 (1952); *Thomas v. United Royalty Co.*, 180 Okl. 230, 233, 68 P.2d 490, 494 (1937); *Good v. Starker*, 216 Wis. 253, 260, 257 N.W. 299, 302 (1934); *Annot.*, 84 A.L.R.2d 479, 484–85 (1962). We adopt that view.

■ Whether the conduct of a purchaser estops him depends on the facts of the case. *See Johnson v. Pattison*, 185 N.W.2d 790, 795 (Iowa 1971). The most persuasive factors in securities cases are "the purchaser's acceptance of dividends, participation in the organization and management of the corporation, and facts showing reliance by the seller upon the conduct of the purchaser," *Annot.*, 84 A.L.R.2d 479, 482 (1962), although we believe the first of these factors is entitled to less weight than the latter two. *Cf.* L. Loss & E. Cowett, Blue Sky Law 168 (1958) (acceptance of dividends does not, in itself, preclude rescission). *See, e. g., Stevens v. Crystal Lake Transportation Sales*, 30 Ill.App.3d 745, 749, 332 N.E.2d 727, 730 (1975) (plaintiff-buyer who was an officer and director of the issuer at the time of sale and who failed to see that the report of sale was filed with the secretary of state was not allowed to rescind the agreement about two and one-half years later on the ground that the shares were not registered); *Wichita Duntile Co. v. Wright*, 130 Kan. 139, 141, 285 P. 635, 636 (1930) (buyer who conveyed land to the issuer in exchange for stock was estopped from recovering title to the property because he acted as a director of issuer and issuer had changed its position by reducing the mortgage and improving the property); *Moore v. Manufacturers Sale Co.*, 335 Mich. 606, 611, 56 N.W.2d 397, 399 (1953) (buyer estopped where he did not complete the purchase until after he had been elected secretary and treasurer of issuer, had full opportunity to examine the company's affairs, had been active in its management, and had made no effort to rescind until proposal was made to put issuer into bankruptcy); *Winfred Farmers Co. v. Smith*, 47 S.D. 498, 500, 199 N.W. 477, 477 (1924) (buyer who participated in activities of issuer for at least six years prior to sale estopped to deny validity of note given for stock); *Tucker v. McDell's Inc.*, 50 Tenn.App. 62, 359 S.W.2d 597, 600 (1962) (buyer estopped when, as part of consideration for purchase, he was elected vice president and director of corporation and approved all changes in policy). Defendants' second argument is untenable under this record, for the purposes of the motions.

■ Regarding defendants' third argument, the issuer is not precluded from relying on estoppel on the ground that the doctrine is only available in an action brought by the purchaser; it may also be asserted in an action brought by the seller. *See Norton v. Lamb*, 144 Kan. 665, 668, 62 P.2d 1311, 1313 (1936); *Wichita Duntile*, 130 Kan. at 141, 285 P. at 636; *Winfred*, 47 S.D. at 500, 199 N.W. at 477.

Returning to Midwest's original arguments, we are unable to agree that "three distinct kinds of estoppel" exist which might bar defendants from asserting the invalidity of their subscription agreements. None of the cases Midwest cites engage in such fine distinctions, but we agree that the different factors which Midwest stresses in its various theories are all relevant circumstances to be considered in determining whether defendants are estopped from asserting violations of chapter 502—including Midwest's detrimental reliance on defendants' representations, defendants' participation in the management of Midwest, and defendants' acceptance of benefits in the nature of capital for the broker-dealer subsidiary they managed.

■ Defendants have not established absence of fact issues on whether they are estopped from asserting Midwest's alleged blue sky violations as affirmative defenses. Both Midwest's affidavit and defendants' depositions show that defendants initiated the sale here. Defendants approached Midwest for the purpose of obtaining capital funds for a new broker-dealer business they hoped to manage. According to the affidavit defendants agreed to purchase stock in return for Midwest's providing $250,000 ini-

tial capital for the broker-dealer business, and on the day the package agreement was reached SC&H were elected as principal officers of Midwest. Stephens was already serving as a director and chairman of the investment committees of Midwest and American Sterling. Also according to the affidavit, Stephens served as chief executive officer of Midwest and American Sterling from July 1970 until December 1971. The record contains additional factors on estoppel, but these are sufficient to illustrate that defendants have not dispelled an issue of fact on whether Stephens and also SC&H, individually or through the conduct of Stephens, are estopped from asserting the invalidity of the subscription agreements. Indeed a fact finder might ultimately infer that defendants' principal cause of disenchantment, after the smoke had cleared away, was not Midwest itself to whose stock they subscribed, but rather the failure of their own broker-dealer business—into which, incidentally, Midwest had poured $400,000 cash most of which defendants proceeded to lose.

F. *Are defendants within the protection of chapter 502?* Midwest cites the accepted principle that securities laws are construed in the light of whether the particular class of persons affected needs the protection of securities legislation. *See Ralston,* 346 U.S. at 125, 73 S.Ct. at 984, 97 L.Ed.2d at 1498–99. Midwest interpolates from that principle two additional ones. The first is that a person who represents his familiarity with securities law is not entitled to its protection, and the second is that a purchaser who holds his stock to see if it is unprofitable before making a decision to rescind is not entitled to the protection of the securities law.

 We reject the argument. Midwest takes a rule of construction used to help determine the scope of securities law provisions which are susceptible to varying interpretations and fashions it into a basis for judicially creating additional securities law exemptions. Although a buyer's representations of expertise may provide evidence that he should be considered a broker for

the purpose of the sales-to-brokers exemption, and may be relevant in an estoppel analysis to the extent they show how knowledgeable of the violation a purchaser was, they do not provide the basis for an exemption independent of those the legislature has provided. Moreover, "[m]erely waiting for a substantial time after the purchase and then electing to rescind because of lack of dividends will not bar rescission," L. Loss & E. Cowett, Blue Sky Law 167 (1958), and "[i]t would not be expected of anyone that he would elect to treat a sale of stock as void until he had discovered it was not profitable for him to retain it." *Bunge v. Kirchoff,* 251 Ill.App. 119, 126 (1928). We decline to hold that representations of expertise or delay in seeking rescission constitute independent grounds for barring buyers from invoking the securities law for their own benefit, absent the elements of estoppel or some other independent ground.

We hold that the district court erred in sustaining defendants' motions for summary judgment on the basis that the subscription agreements violated section 502.6 of the Iowa Code. The record contains genuine issues of fact as to whether Stephens was the actual purchaser of 100,000 shares, whether he was an employee of Midwest for the purpose of the sales-to-employees exemption, and whether all defendants were brokers or dealers for the purpose of the sales-to-brokers/dealers exemption. Genuine issues of fact also exist as to whether defendants' conduct estops them from asserting chapter 502 as an affirmative defense to this action.

III. *Federal securities law.* The second ground on which the district court sustained defendants' motions was that the subscription agreements violated section 77e of title 15, United States Code, which makes the sale of a security "unlawful" unless a registration statement containing prescribed information has been filed with SEC. The 1933 Act does not expressly state that sales of unregistered stock are "voidable." Section 77*l* of the same chapter, however, entitles purchasers of stock sold in violation of section 77e to rescind their agreements and

recover any consideration paid; it has been construed to allow purchasers of such stock to treat their purchases as voidable. *Brynes v. Faulkner, Dawkins & Sullivan*, 550 F.2d 1303, 1313 (2nd Cir. 1977). Midwest does not deny that the subscription agreements on which this action is based are contracts for the sale of securities or that the stock covered by the agreements was not registered with SEC. If the securities do not qualify for exemption under federal securities law, defendants would be entitled to rescind the agreements unless one of Midwest's other contentions applies.

As in the case of Iowa chapter 502, the objective of the Securities Act of 1933 is to protect investors against fraud, provide "full disclosure of material information concerning public offerings of securities," and promote "ethical standards of honesty and fair dealing." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668, 677–78 (1976). Because the Act is remedial, exemptions are strictly construed. *SEC v. Culpepper*, 270 F.2d 241, 246 (2nd Cir. 1959); *SEC v. Sunbeam Gold Mining Co.*, 95 F.2d 699, 701 (9th Cir. 1938).

A. *The intrastate exemption.* Section 3(a)(11) of the 1933 Federal Securities Act exempts from registration:

> Any security which is a part of an issue offered and sold only to persons resident within a single State or Territory, where the issuer of such security is a person resident and doing business within . . ., such State or Territory.

The primary purpose of this exemption is "to allow an essentially local business to raise money within the state where the investors would be likely to be familiar with the business and with the management. . . ." Sec. Act Rel. 5450 (Jan. 7, 1974), 39 F.Reg. 2353.

■ Was the district court right in finding no issue of fact existed as to whether Midwest was "doing business within" Iowa for the purpose of the exemption? For relevant aids to the interpretation of the "doing business within" requirement of section 3(a)(11), we look to court decisions, SEC rules, releases, and no-action letters.

The exemption is construed quite narrowly. Sec. Act Rel. 5450. A predominant amount of the issuer's income-producing activity must be carried on in-state. *See Chapman v. Dunn*, 414 F.2d 153, 159 (6th Cir. 1969); *McDonald*, 343 F.Supp. at 345. Substantially all of the proceeds from the offering must be put to use within the local area. *McDonald*, 343 F.Supp. at 346; *SEC v. Truckee Showboat, Inc.*, 157 F.Supp. 824, 825 (D.Cal.1957). On the other hand, a realistic interpretation of the exemption could hardly require that the issuer do one hundred percent of its business in state in order to qualify. McCauley, *Intrastate Securities Transactions Under the Federal Securities Act*, 107 U.Pa.L.Rev. 937, 950 (1959).

Defendants argue that undisputed facts demonstrate Midwest cannot come within the intrastate exemption. For a period commencing in 1969 and ending sometime in 1970, the sole business of Midwest was conducted through its American Sterling subsidiary. By deposition the president of American Sterling estimated that seventy-five percent of that company's business during 1969 and 1970 consisted of policies which were originally sold in Minnesota and South Dakota by agents of a third insurance company licensed to do business in those states. American Sterling had an agreement with that company to reinsure the Minnesota and South Dakota policyholders. On the basis of that figure, defendants contend that Midwest cannot be said to do a substantial portion of its business in Iowa.

■ We disagree with the assertion that if seventy-five percent of Midwest's insurance revenue came from out of state, Midwest could not as a matter of law meet the "doing business within" requirement of section 3(a)(11). The crucial issue is not the location of the parties who pay its income, but rather the location of Midwest's income-producing activity. *See* Sec. Act Rel. 5450. The cited release provides several examples of issuer corporations which come within the "safe harbor" provisions of rule 147, a rule promulgated by SEC to provide

a more detailed standard for issuers trying to bring themselves within the requirements of section 3(a)(11). The fourth example in the release states that an engineering company which derives approximately 50% of its revenues from clients located in other states nevertheless meets the rule 147 requirement that 80 percent of the issuer's revenue be derived from instate operations of the business. Similarly we must look here to the location of Midwest's income-producing activity, not to the location of its customers, to determine whether a predominant amount of its income-producing activity occurs in the state. *See also, Eastern Leasing Corp.*, [1979 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 82,157 (SEC no-action letter dated April 20, 1979) (corporation which purchases and leases equipment upon referral from various equipment dealers throughout the United States and Canada satisfies "doing business within" requirement of rule 147); *American Computer Communications Co.*, [1976–1977 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 80,686 (SEC no-action letter dated June 15, 1976) (issuer qualified for "doing business within" requirement of rule 147 although its sales were conducted in part through three manufacturers' representatives who were independent contractors outside the state).

An issue of fact exists under the record as to whether Midwest meets the "doing business within" requirement of section 3(a)(11). Among the assertions in the affidavit accompanying Midwest's resistance which are relevant to this issue are the following:

(1) The principal offices of Midwest and each of its subsidiaries are located in Iowa;

(2) All officers and employees of Midwest and its subsidiaries are residents of Iowa, with the exception of one officer and four employees located in a Chicago office of the broker-dealer subsidiary beginning in April 1971;

(3) At all times through the completion of the stock offering all contracts, orders, and transactions which were accepted by Midwest and its subsidiaries were accepted and executed by them in Iowa;

(4) All services of American Sterling relating to its insurance contracts were rendered by officers and employees in Midwest's principal office in Des Moines, Iowa;

(5) At all times through the completion of the stock offering, Midwest and its subsidiaries did not own or have any interest in any land or tangible property located outside of Iowa;

(6) Almost the entire proceeds of Midwest's two earlier limited stock offerings were used in connection with its insurance business located within Iowa;

(7) The $5000 proceeds which Midwest received from the instant offering were used solely for Midwest's business in Iowa.

■ Defendants are correct that a corporation cannot qualify for the section 3(a)(11) exemption merely by doing its bookkeeping in-state. *See* Sec. Act Rel. 4434 (Dec. 6, 1961), 26 F.Reg. 11896. We believe however the factors we have related go considerably beyond "bookkeeping" to create an issue of fact as to whether Midwest meets the "doing business within" requirement. *See SEC v. North American Acceptance Corp.*, [1979 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,706 (D.Ga.1978).

In several rulings cited by defendants, SEC staff refused to concede that the applicants met the requirements of rule 147. By its express terms, however, that rule is not exclusive and an issuer's failure to satisfy its provisions "shall not raise any presumption that the exemption provided by section 3(a)(11) of the Act is not available . . . ." 17 C.F.R. § 230.147 (1974). While staff findings that certain issuers qualify under more restrictive rule 147 may be helpful in showing that another issuer qualifies for the 3(a)(11) exemption, the rulings in which issuers are denied rule 147 status have less significance in terms of the scope of section 3(a)(11). We do not suggest on this record, of course, that the in-state exemption applies as a matter of law.

■ B. *Securities Act limitations.* The limitation question here is similar to the one

we resolved regarding the Iowa blue sky law, and we arrive at the same conclusion. Because the time limitation in the federal securities act does not bar purchasers from asserting violations of the 1933 Act defensively, *Key Broadcasting System v. Griffith,* 119 N.Y.S.2d 174, 175 (Sup.Ct.1953), we reject Midwest's contention that defendants here are barred from pleading a violation of the section 77e registration requirement.

■ C. *Defendants' failure to tender their subscription contracts.* The issue of tender under the federal law is similar to the one we resolved under the Iowa blue sky law and we arrive at the same holding. Because defendants are not barred by the federal limitations statute from alleging Midwest violated the section 77e registration requirement, they are not barred from tendering their agreements to Midwest, and since tender may be made in court, *see Chapman,* 414 F.2d at 160; *Stadia Oil & Uranium Co. v. Wheelis,* 251 F.2d 269, 273–74 (10th Cir. 1957), defendants may do so on remand.

■ D. *Estoppel.* The estoppel argument which plaintiff makes here is very similar to the one it made regarding its alleged violations of the Iowa blue sky law, and we answer that argument in the same manner. Although some disagreement exists among the federal courts as to the availability of equitable defenses against allegations that stock transactions are violative of the 1933 Act, *see Annot.,* 26 A.L.R. Fed. 682, 685 (1976), several federal courts have recognized that purchasers may be estopped by their conduct from asserting an issuer's failure to comply with the registration provisions of the 1933 Act. *See Meyers v. C & M Petroleum Producers, Inc.,* 476 F.2d 427, 429–30 (5th Cir.), *cert. denied,* 414 U.S. 829, 94 S.Ct. 56, 38 L.Ed.2d 64 (1973); *Fuller v. Dilbert,* 358 F.2d 305 (2d Cir. 1966), *aff'g* 244 F.Supp. 196, 214 (D.N.Y. 1965); *Straley v. Universal Uranium & Milling Corp.,* 289 F.2d 370, 373 (9th Cir. 1965); *Belhumeur v. Dawson,* 229 F.Supp. 78, 86 (D.Mont.1964). *Cf. Can-Am Petroleum Co. v. Beck,* 331 F.2d 371, 373–74 (10th Cir. 1964) (recognizing availability of in pari delicto doctrine as defense to registration violation, but finding it inapplicable to facts of the case). We find that the same evidence we relied on with regard to plaintiff's estoppel claim under the Iowa Act demonstrates that defendants have not dispelled an issue of fact as to whether they are estopped from asserting the invalidity of the stock subscription agreements under federal law.

E. *Are defendants protected by the 1933 Act?* The question of whether defendants are within the protection of the 1933 Act is very similar to the parallel argument we resolved with regard to the blue sky law, and we arrive at the same result. Since Midwest's argument would in essence require us to create judicially an additional exemption to the registration provision of the 1933 Act, we decline to accept it.

We thus hold that the district court erred in sustaining defendants' motions for summary judgment on the basis that the subscription agreements violated section 77e of title 15. An issue of fact exists as to whether Midwest was "doing business in-state" for the purpose of the intrastate exemption and on the estoppel issue.

IV. *Mutuality of obligation.* The third ground on which the district court sustained defendants' motions for summary judgment was that the subscription agreements lacked mutuality of obligation and were therefore unenforceable. The court apparently based its decision on the general rule that if mutual promises constitute the mutual consideration of a contract, each promise must itself be enforceable in order to render the contract enforceable. *See Des Moines Blue Ribbon Distributors, Inc. v. Drewrys Limited United States of America, Inc.,* 256 Iowa 899, 906, 129 N.W.2d 731, 736–37 (1964). We will assume for purposes of analysis that the court was correct in finding that the parties' mutual promises constitute the mutual consideration for the contracts. The issue then is whether the mutual promises in this contract were enforceable.

Defendants contend that Midwest's promises to sell stock are not enforceable because

of a cancellation clause in each contract. Those clauses state in part:

> The Corporation may cancel this agreement . . at any time (1) if there is any default in payment; or (2) if the Corporation in its sole discretion determines that any representation made by me [buyer] is not correct or that I have breached any warranty contained in this agreement or in any prior agreement with the Corporation or subscription for its shares; or (3) if, upon advice of counsel, the Corporation reasonably deems cancellation advisable in order to comply with any law or rule regarding securities or with any rule of the Insurance Department of the State of Iowa. . . .

 We do not agree that the cancellation clause renders Midwest's promise to sell stock to defendants unenforceable. Defendants are right that reservation of an absolute right to terminate an executory agreement negates a contract, because the agreement cannot be enforced and it therefore lacks mutuality. *See Kazos v. Ginsberg's, Inc.*, 241 Iowa 395, 403, 41 N.W.2d 30, 35 (1950); Corbin, *The Effect of Options on Consideration*, 34 Yale L.J. 571, 574 (1925). But such is not this case. An agreement will not be given an interpretation which places one party at the mercy of another unless the contract clearly requires that result. *Freese v. Town of Alburnett*, 255 Iowa 1264, 1268–69, 125 N.W.2d 790, 793 (1964). Accordingly courts endeavor to construe contracts so as not to allow parties to terminate at will. *See Clark v. Kelly*, 109 N.W. 292, 293 (Iowa 1906); *Miller v. O. B. McClintock Co.*, 210 Minn. 152, 160, 297 N.W. 724, 729 (1941); *Fulcher v. Nelson*, 273 N.C. 221, 224, 159 S.E.2d 519, 522 (1968); Restatement of Contracts § 265 (1932); 17 Am.Jur.2d *Contracts* § 496 (1964); 17A C.J.S. *Contracts* § 399, at 484 (1963).

Applying these principles here, we find that the clause does not grant Midwest an absolute right to terminate the subscription agreements and that it could terminate the contracts only under certain conditions. Even though the contract purports to leave the determination of one of the conditions to the "sole discretion" of Midwest, we do not believe that such discretion could be exercised arbitrarily. Midwest would have had to exercise that discretion in a reasonable manner on the basis of fair dealing and good faith. *See City of Bowling Green v. Knight*, 216 Ky. 838, 840–41, 288 S.W. 741, 742 (1926); *Richard Bruce & Co. Inc. v. J. Simpson & Co., Inc.*, 40 Misc.2d 501, 504, 243 N.Y.S.2d 503, 506 (1963) ("absolute discretion" interpreted to require reasonable discretion based on fair dealing and good faith). Midwest's promise to sell shares of its stock to defendants was enforceable and did not give rise to want of mutuality. We need not consider the other claimed consideration for the contract.

Fact questions exist as to whether defendants' subscription contracts are enforceable by Midwest. The district court should have overruled defendants' motions for summary judgment.

REVERSED AND REMANDED.